238 So.2d 565 (1970)
In re Inquiry Concerning a Judge No. 1, Richard A. KELLY, Circuit Judge.
No. 38595.
Supreme Court of Florida.
June 17, 1970.
Rehearing Denied September 14, 1970.
*566 Masterson, Lloyd, Sundberg & Rogers, St. Petersburg, and Fowler, White, Collins, Gillen, Humkey & Trenam, Tampa, for petitioner.
William D. Hopkins and F.E. Steinmeyer, III, Tallahassee, for respondent.
Joseph F. McDermott, St. Petersburg, as amicus curiae committee for Judge Kelly.
ADKINS, Justice.
We have for consideration a petition to reject the recommendations, findings and conclusions of the Florida Judicial Qualifications Commission in its first proceeding. Rule 24(a), Florida Judicial Qualifications Commission Rules (F.J.Q.C.R.), 32 F.S.A. The Commission found petitioner Judge Richard A. Kelly of Dade City, Florida, guilty of certain conduct unbecoming a member of the judiciary.
Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary. The record in this case clearly reflects a pattern of petitioner's hostility toward many attorneys, court officials, and fellow judges, as well as a concerted effort to pamper the public and news media by press releases designed to bolster his personal image at the expense of the judiciary. This is conduct unbecoming a member of the judiciary.
Petitioner is a judge of the Sixth Judicial Circuit of the State of Florida and a resident of Pasco County. He was first elected a circuit judge in November 1960, and was reelected to that office in the general election of November 1966.
Petitioner was the subject of impeachment proceedings before the Florida Legislature in 1963, and was acquitted.
On February 13, 1968, petitioner was elected Presiding Judge of the Sixth Judicial Circuit. He immediately demanded that various changes in the method by which criminal prosecutions were handled in the circuit, ordered one of the newly-appointed judges to duty in Pasco County for ninety days even though this judge resided in St. Petersburg, Pinellas County (this order was rescinded), indicated that he was going to transfer all domestic relations cases to one particular judge of the circuit, proposed the elimination of special masters in uncontested divorce cases, ordered the official court reporter to report all Justice of the Peace hearings upon call of the *567 Public Defender of Pinellas County. Although some of petitioner's proposals may have been appropriate, the Commission found that they were presented in such a manner as to create turmoil, confusion and chaos within the circuit. As a result, a majority of the other judges of the circuit determined to remove or recall him as presiding judge in March of 1968. He was notified of the determination of the majority on March 19, 1968.
Judge Kelly first requested the judges to refrain from removing him or recalling him, assuring them he would return to Pasco County and not interfere with the administration of the court in Pinellas County if they would let him remain as presiding judge. When this offer was not accepted by the other judges, he requested and was granted a week's reprieve in order that he might tender his resignation as presiding judge.
After this delay, a majority of the circuit judges again met with Judge Kelly to consider his recall as presiding judge. At this meeting Judge Kelly polled all of the judges and determined that they still intended to remove him as presiding judge. He then announced his resignation; but threatened those in attendance that they would regret their actions and that he would cause them embarrassment.
Several days later he arranged an appointment with the editor and several reporters of a local newspaper in St. Petersburg to enlighten them about a petition he intended to file proposing certain alleged judicial reforms. Subsequently, on April 5, 1968, he filed with the Clerk of the Circuit Court what was styled "Petition to the Judges of the Sixth Judicial Circuit in the Circuit Court of Pinellas County." His fellow judges were not given an opportunity to see or examine the contents of the petition although it contained suggested court reforms and criticism of court administration. As an example of petitioner's public criticism of his fellow judges, the petition stated:
"The tremendous reduction in the number of prisoners between September, 1965, and September, 1966, is an excellent case in point for the purpose of showing the gross lack of administration of the Circuit Court in Pinellas County and the serious consequences of a poorly administered Court. The change was accomplished with the simple expediency of appointing the Public Defender at an early date, and yet to bring this simple administrative change into effect resulted unreasonably in crisis, controversy and ill-will among the judges which varied only in degree from the same response that has met every other suggestion to improve administration.
"Soon after the undersigned took office in 1961, he started urging that the procedure for expediting criminal cases, especially cases in which the defendant was being held in jail, be reviewed. Years went by and nothing was done in Pinellas County; then in 1965, your Petitioner went to the then Criminal Administrator for Pinellas County and requested the reform and argued its urgency. The rejection was unqualified. During the same time a grand jury was convened in Clearwater, empaneled by the Criminal Administrator and although it is the duty of a judge presiding over a grand jury to instruct the grand jurors of their duties, no instruction was given regarding Section 905.16 of the Florida Statutes."
"* * *
"Virtually every phase of the criminal administration at the present time is burdened with inefficiency."
"* * *
"Vast and important and much needed judicial reforms await only the interest and action by the judges of this circuit."
"* * *
"The individual judges should impose additionally upon their secretaries in *568 handling the administration and disposition of criminal cases and thus avoid the luxury of a secretary to the Criminal Administrator or Presiding Judge."
Apparently, for the purpose of seeking favorable publicity for himself, petitioner misrepresented the facts in this petition regarding his removal as presiding judge when he said:
"This Petitioner has resigned a position he coveted to remove any possibility of personality and vanity as a consideration in the discharging of this obligation."
The office of the Clerk of the Circuit Court is not a receptacle for the ex parte grievance petition of a politician, particularly when the object is to seek revenge by embarrassing public officials. Since we have a government of law and not of men, no member of the judiciary should act officially as a "judge" save only as it is found in and defined by the law. Petitioner knew judicial reform could be attained in a variety of ways "under the law," but vengeance could best be served through publicizing his grievance. This was accomplished when petitioner, in his official capacity as a judge, filed his ex parte petition with the clerk so that it would be a public record.
The evidence is replete with instances in which the judicial temperament of petitioner was lacking. Nineteen of the approximately twenty-one lawyers of Pasco County were willing to, and did, sign a petition for the impeachment of Judge Kelly; seven lawyers left Dade City in Pasco County because of Judge Kelly; many cases ordinarily filed in Pasco County were filed out of the county because of Judge Kelly; attorneys and court personnel were fearful of Judge Kelly; he was rude and inconsiderate of attorneys and court personnel. His erratic behavior culminated in the filing of the petition.
The filing of the petition by Judge Kelly came to the attention of the Florida Judicial Qualifications Commission and precipitated a preliminary investigation. This Commission was created under the provisions of art. V, Sec. 17A(2), Fla. Const., Subsection (3) of which contains the following provisions:
"Any justice or judge to whom this section applies may be disciplined by private reprimand or removed from office for willful or persistent failure to perform his duties or habitual intemperance or conduct unbecoming a member of the judiciary or he may be involuntarily retired for disability seriously interfering with the performance of his duties, which is, or is likely to become, permanent in nature. After such investigation as it deems necessary, the judicial qualifications commission may conduct a hearing concerning the removal, discipline or retirement of a justice or judge or request the supreme court to appoint three (3) special referees, who shall be active or retired justices or judges of courts of record, to hear and take evidence in any such matter, and to report thereon to the commission. * * * If after hearing, or after considering the record and report of the referees, the commission finds good cause therefor, it shall recommend to the supreme court the removal, discipline or retirement of the justice or judge. The supreme court shall review the record of the proceedings on the law and facts and shall order removal, discipline or retirement, as it finds just and proper, or wholly reject the commissioner's recommendation."
These constitutional provisions vest jurisdiction over the discipline of circuit judges in this Court and authorize it to exercise such jurisdiction through the Judicial Qualifications Commission. By the express provision of art. V, Section 17A(1), all justices or judges included within the constitutional provision are still liable to impeachment for any misdemeanor in office.
Petitioner complains that the proceedings before the Commission and its *569 recommendations abridge his freedom of speech in violation of the First and Fourteenth Amendments to the United States Constitution and the Declaration of Rights of the Florida Constitution. He argues that he is being punished solely because his petition was published in the St. Petersburg Times and cites numerous decisions saying that the criticism of the judiciary must create a clear and present danger of disrupting the administration of justice before his utterances may be punished.
The proceeding before the Commission lacks the essential characteristics of a criminal prosecution. The object is not to inflict punishment, but to determine whether one who exercises judicial power is unfit to hold a judgeship. The Commission, created by the Constitution as an arm of this Court, is authorized to conduct a hearing for the purpose of aiding this Court in determining whether a judge is unfit or unsuitable. Under the provisions of the Constitution this Court may exclude from the judiciary those persons whose unfitness or unsuitability bears a rational relationship to his qualifications for a judgeship, so long as the adjudication of unfitness rests on constitutionally permissible standards and emerges from a proceeding which conforms to the minimum standards of due process. In short, the essence of the sanction imposed is not "punishment" but a reprimand based on grounds bearing rational relationship to the interest of the State in the fitness of its judicial personnel. See Sharpe v. State ex rel. Oklahoma Bar Association, 448 P.2d 301 (Okl.Jud. 1968), cert. den., 394 U.S. 904, 89 S.Ct. 1011, 22 L.Ed.2d 216, where the Court discussed the applicability of the Sixth Amendment to the United States Constitution (Right to Jury Trial), in a proceeding before the trial division of the Court on the judiciary.
In these proceedings we are not faced with the question of petitioner's right of freedom of speech or with the contents of his pronouncements. The question is whether the motive of, and the methods used by, the petitioner together with the resulting turmoil created by his actions should be considered as conduct unbecoming a member of the judiciary and contrary to the Canons of Judicial Ethics.
Public understanding of the judicial processes can be obtained only through the use of responsible and informed news reporting. This understanding secures the respect and obedience of the general populace so that the Court may effectively protect the rights of individuals as well as the rights of society. The public's access to information concerning the functions of various branches of government should not be limited and the public's right to know should be jealously guarded by the judiciary. The courts have never demanded favorable publicity.
There are many authorized methods of protest, dissent and criticism within the framework of the judiciary, such as the preparation of dissenting opinions, petitions to the Supreme Court for changes in the rules of procedure, submission of suggested changes to various committees of the Florida Bar, participating in the various legal seminars conducted by the Committee on Legal Education, or taking an active part in the state and local conferences of judges.
Criticism is not neutral. When a judge sets himself up to criticize other judges, his criticism ultimately must be viewed as having been constructive or destructive in its impact. If he has been temperate and judicious, his criticism is likely to be, in its ultimate result, beneficial to the community which he serves  and it does not matter whether this constructive criticism is publicly or privately voiced. On the other hand, impetuous argument, or criticism taken by methods which prevent honest discussion and a fair rebuttal can be expected only to have a destructive result. No matter how bland or even wholesome the content, if the methods used raise suspicion of motives among the judges, and *570 renders the courts all suspect to the public, the result can only be an increase in disrespect for law and order, an increase in lawlessness, a greater tendency among some of our citizens to let loose their tendencies to disorder.
By the use of the power and prestige of his judicial position, the petitioner consistently sought favorable newspaper publicity in furtherance of his general political ambition and in an effort to force his views upon his fellow judges. He cannot avoid the resulting inquiry as to his motive and methods by invoking the right of freedom of speech in this disciplinary proceeding. We are not concerned with his right to speak, but whether his motive or method does violence to the Canons of Judicial Ethics.
The petitioner complains that the Commission report wrongfully and unnecessarily includes comments as to the alleged mental disability or illness of petitioner even though he was acquitted of this charge. The initial charges contained the charge that "you have a disability seriously interfering with the performance of your duties."
After several days of testimony, much of which related to an alleged mental disability from which Judge Kelly may have been suffering, the Commission recessed the hearing and directed that an amendment to the formal charges be filed pursuant to Rule 15, F.J.Q.C.R., setting up the alleged mental disability. Pursuant to Rule 12(b), F.J.Q.C.R., the Commission further directed that Judge Kelly submit to a psychiatric examination.
Judge Kelly declined to submit to an examination by the Commission-appointed psychiatrist and the Commission resumed its hearing. Because of his failure to submit to the psychiatric examination ordered by the Commission, Judge Kelly was not allowed to offer evidence of medical doctors as to his mental condition. This limited the record to lay testimony previously given as to his mental condition in accordance with general Florida authorities. See: 6 F.L.P., Criminal Law, § 467; 13 Fla.Jur., Evidence, § 329; Redfearn, Wills and Administration in Florida, 4th Ed. Vol. 1, § 4.18, p. 78, and § 10.23, p. 206; Armstrong v. State, 30 Fla. 170, 11 So. 618; Norman v. State, 156 So.2d 186 (Fla.App. 1963); Byrd v. State, 178 So.2d 886 (Fla.App. 1965); Brady v. State, 190 So.2d 607 (Fla.App. 1966); 72 A.L.R., p. 579; 40 A.L.R.2d, p. 22. The Commission correctly found that the evidence was insufficient to support a finding that Judge Kelly had a mental or emotional disability that seriously interfered with his conduct as a circuit judge. However, it was appropriate for the Commission to make reference to this testimony in determining whether the Judge, by reason of his conduct in the various matters charged, destroyed confidence in the Court and in the efficiency of the petitioner.
Because of the nature of the proceeding, the doctrines of res judicata and double jeopardy do not apply. The Commission may at any time consider any acts of misconduct which reflect adversely upon the general character and fitness necessary to the proper performance of the duties of judicial office. The accumulation of minor incidents may only justify a reprimand at this time, but, if continued, may result in unbecoming conduct sufficient to warrant removal from office. The reprimand does not amount to an acquittal, nor does it have the elements of a final judgment necessary to invoke the principles of res judicata. See 10 F.L.P., Former Adjudication, § 8.
Petitioner also contends that the proceedings before the Commission denied him due process of law in violation of the Fourteenth Amendment to the United States Constitution and the Declaration of Rights of the Florida Constitution in that the Commission was illegally constituted, being vested with the functions of investigation, prosecution, grand jury, and judge and jury of facts and law.
*571 The proceedings were in accord with that established by Sec. 17A, Art. V, Fla. Const., and the Rules of Procedure adopted by this Court.
The following appears in Annotation, 98 Law Ed. 855:
"Procedural due process, that is, the element of the due process provisions of the Fifth and Fourteenth Amendments which relates to the requisite characteristics of proceedings seeking to effect a deprivation of life, liberty, or property, may be described as follows: one whom it is sought to deprive of such rights must be informed of this fact (that is, he must be given notice of the proceedings against him); he must be given an opportunity to defend himself (that is, a hearing); and the proceedings looking toward the deprivation must be essentially fair."
And further, on page 857:
"Proceedings looking toward the suspension or revocation of a medical or legal professional license are free of any due process defect, so far as procedure is concerned, so long as the basic requisites of notice and hearing are complied with; the form of the notice and hearing is immaterial."
Attorneys were retained to present the charges and petitioner had the benefit of counsel in his defense. In fact, the hearing afforded petitioner met all the standards of judicial procedure. The findings of the Commission were not made until after a fair investigation and with such notice, hearing and opportunity to answer for the petitioner as would constitute due process. See Annotation, 6 Law Ed.2d 1332.
While the Judicial Qualifications Commission is not technically a judicial tribunal, its findings and recommendations should be considered as though an intermediate agency of this Court. The Commission is in fact an arm of this Court dealing with a vital function of the Court and under its exclusive jurisdiction. While the power to render the ultimate judgment in these cases is vested in this Court, the findings and recommendations of the Florida Judicial Qualifications Commission are entitled to receive due consideration and are of persuasive force. The Constitution requires that the Commission be composed of:
"(a) Two (2) judges of the district courts of appeal appointed by the judges of those courts and two (2) circuit court judges appointed by the judges of those courts.
"(b) Two (2) members of The Florida Bar, who shall have practiced law in this state for at least eight (8) years, appointed by the board of governors of The Florida Bar; and
"(c) Three (3) citizens, each of whom shall have been a resident of this state for at least five (5) years, neither of whom shall be a justice or judge of any court, active or retired, nor a member of The Florida Bar, appointed by the governor." Sec. 17A(2), Art. V, Fla. Const.
In view of these constitutional provisions prescribing the composition of the Commissions, its findings should be given great weight. However, the ultimate responsibility of making a determination rests with this Court, for Sec. 17A(3), Fla. Const., requires that the Supreme Court, after reviewing the record, "shall order removal, discipline or retirement, as it finds just and proper, or wholly reject the Commission's recommendation."
The findings of the Commission contained the following:
"The publicity incidental to the filing of this petition did bring the Sixth Judicial Circuit into disrepute and, as testified to, it was known as the "sick" Circuit. Certainly the public has a right to know of the affairs of its judicial system and our finding is not a criticism of the public's right to know of the court's operation. *572 Our finding is that Judge Kelly failed to follow recognized methods of proposing changes in judicial procedure, that he failed to cooperate with his fellow Judges in that he did not afford them an opportunity to be aware of his charges and the contents of the petition or give them an opportunity for consideration thereof prior to filing. Rather, he was more interested in creating controversy and in publicity for himself than in accomplishing court reform.
"It is our conclusion that said conduct and activities violated Canons 8, 20, 21, 23, and 34 of the Canons of Judicial Ethics as adopted by the Supreme Court of Florida."
The Canons of Judicial Ethics, 32 F.S.A., referred to in the findings are as follows:
"8. Court Organization.
"A judge should organize the court with a view to the prompt and convenient dispatch of its business and he should not tolerate abuses and neglect by clerks, and other assistants who are sometimes prone to presume too much upon his good natured acquiescence by reason of friendly association with him.
"It is desirable too, where the judicial system permits, that he should cooperate with other judges of the same court, and in other courts, as members of a single judicial system, to promote the more satisfactory administration of justice." (Emphasis supplied)
"20. Influence of Decisions upon the Development of the Law  .
"A judge should be mindful that his duty is the application of general law to particular instances, that ours is a government of law and not of men, and that he violates his duty as a minister of justice under such a system if he seeks to do what he may personally consider substantial justice in a particular case and disregards the general law as he knows it to be binding on him. Such action may become a precedent unsettling accepted principles and may have detrimental consequences beyond the immediate controversy. He should administer his office with a due regard to the integrity of the system of the law itself, remembering that he is not a depository of arbitrary power, but a judge under the sanction of law." (Emphasis supplied)
"21. Idiosyncrasies and Inconsistencies  .
"Justice should not be moulded by the individual idiosyncrasies of those who administer it. A judge should adopt the usual and expected method of doing justice, and not seek to be extreme or peculiar in his judgments, or spectacular or sensational in the conduct of the court. Though vested with discretion in the imposition of mild or severe sentences he should not compel persons brought before him to submit to some humiliating act or discipline of his own devising, without authority of law, because he thinks it will have a beneficial corrective influence.
"In imposing sentence he should endeavor to conform to a reasonable standard of punishment and should not seek popularity or publicity either by exceptional severity or undue leniency." (Emphasis supplied)
"23. Legislation  .
"A judge has exceptional opportunity to observe the operation of statutes, especially those relating to practice and to ascertain whether they tend to impede the just disposition of controversies; and he may well contribute to the public interest by advising those having authority to remedy defects of procedure, of the result of his observation and experience." (Emphasis supplied)
"34. A summary of Judicial Obligation  .
"In every particular his conduct should be above reproach. He should be conscientious, *573 studious, thorough, courteous, patient, punctual, just, impartial, fearless of public clamor, regardless of public praise, and indifferent to private political or partisan influences; he should administer justice according to law, and deal with his appointments as a public trust; he should not allow other affairs or his private interests to interfere with the prompt and proper performance of his judicial duties, nor should he administer the office for the purpose of advancing his personal ambitions or increasing his popularity." (Emphasis supplied)
The findings of the Judicial Qualifications Commission are amply supported by the record and are approved and adopted by this Court.
The crucial question is whether the activities of the petitioner were for the purpose of effecting court reform or for the purpose of securing personal notoriety and furthering a career in politics.
There were many witnesses who testified on behalf of petitioner and he has enjoyed popularity among many of the electors. Any arm of government should be reticent in exercising the power to nullify the elective process by discipline or removal of elected officials. But this constitutional power, granted to this Court by the mandate of the people, should be exercised when the judiciary is endangered by a judge seeking to bolster his personal image.
Ordinarily, elected officials who wish to stay in office must organize their behavior according to rational standards; if not, they are likely to be defeated at the polls or at least will face expensive and harrowing campaigns for re-election. Under our system, where judges are elected, the members of the judiciary are constantly enmeshed in the conflict between candor and responsibility  maintaining the candor of the politician without shirking the responsibilities of a judge. The Judicial Canons of Ethics provide the guidelines for the conduct of our judges.
The personal integrity, intellectual vigor, and selfless dedication of a judge should be directed toward the attainment of what he earnestly believes to be sound law, wise public policy, and justice. Candid discussion and mutual trust among the judges of a court are of great value in attaining these ends. These are the responsibilities of a judge. In his candor as a politician, an individual judge should never protest or dissent in such a manner as to discourage the free exchange of ideas within the court, for this free exchange of ideas is an important function in the judicial process of reaching the goal of sound law, wise public policy, and justice.
It may often be difficult for a judge to work toward overturning a ruling or an administrative policy of the Court without injuring or risking injury to the prestige of the Court. Stirring up resistance among fellow judges by threatened adverse publicity is fraught with danger. It is dangerous to the judge's position within the Court since his colleagues may take such a threat as an act of institutional disloyalty. It is dangerous to the possible future success of his own policies. Moreover, it could be dangerous to the prestige and general power of the Court in encouraging not only additional opposition, but also attacks from misinformed groups and agencies who happen to be alienated by virtue of some former decision or policy of the Court.
The candor of petitioner as a politician resulted in a large group of dedicated followers, but, in the final analysis, his candor as a politician caused him to shirk his responsibilities as a member of the judiciary. Every man in public office hungers for public esteem, but no man has the right to buy this esteem with the stolen coin of other men's public reputations, not even a twice-elected member of the judiciary.
The petitioner clearly violated the basic principles of the Canons of Judicial Ethics. *574 Continued violations of these principles by a judge could make our judiciary another Samson, blind to duty and swollen with power, pulling down the pillars that support our most cherished institutions.
The Commission has recommended that petitioner be required to discharge the duties of resident Circuit Judge of Pasco County in the Sixth Judicial Circuit and refrain from service in Pinellas County of the Sixth Judicial Circuit unless assigned by the Presiding Judge of the Circuit to duty in Pinellas County, pursuant to Rule 1.020(c) (4), Florida Rules of Civil Procedure, 30 F.S.A.
Sec. 17A(3), Art. V, Fla. Const., authorizes this Court to order "removal, discipline or retirement as it finds just and proper." This authorization does not contemplate an order limiting the activities of a duly elected Circuit Judge to a specific area in the Circuit. The Presiding Judge has the authority to enter such orders as may be necessary "for the efficient and speedy disposition of the business of the court." Rule 1.020(c) (1), Florida Rules of Civil Procedure. Matters of internal administration should be left to the Presiding Judge. The recommendations of the Commission are modified so as to strike therefrom subparagraph (d), reading as follows:
"In accordance with his admission that there is sufficient work in Pasco County to keep him occupied on a full time basis, that he discharge the duties of a resident Circuit Judge of Pasco County in and for the Sixth Judicial Circuit, and refrain from service in Pinellas County of the Sixth Judicial Circuit, unless assigned by the Presiding Judge of said Circuit to duty in Pinellas County pursuant to Rule 1.020(c) (4), Florida Rules of Civil Procedure."
Petitioner Richard A. Kelly has engaged in conduct unbecoming a member of the judiciary and he is hereby publicly reprimanded for such conduct. The said Richard A. Kelly is admonished to comply with his oath as a member of the judiciary and to abide by the Canons of Judicial Ethics as a member of the judiciary, particularly in cooperating with his fellow judges, following the normal method for seeking procedural changes as to the administration of justice in the Sixth Judicial Circuit, and refraining from seeking personal publicity or attempting to advance his personal ambitions through the public information media. The entire record of this inquiry may be introduced into evidence in any subsequent inquiry which may be brought before the Judicial Qualifications Commission concerning Richard A. Kelly.
It is so ordered.
THORNAL, CARLTON and BOYD, JJ., concur.
ERVIN, C.J., dissents with opinion.
LARKIN and LaMOTTE, Circuit Judges, dissent and concur with ERVIN, C.J.
ERVIN, Chief Justice (dissenting).
The charges against Judge Kelly and the findings of the Commission from the evidence taken thereon do not logically appear to me to fall within the category of habitual judicial intemperance or unbecoming judicial conduct as contemplated in Section 17A(3), Article V, State Constitution.
First, I do not find from the record that Judge Kelly violated constitutional sanctions against judicial intemperance and unbecoming judicial conduct by his action of filing with the Clerk of the Circuit Court of Pinellas County a document, styled "Petition to the Judges of the Sixth Judicial Circuit in the Circuit Court of Pinellas County," which generated certain attendant publicity. I do not find from the record that Judge Kelly's proposals for administrative judicial reform in his circuit "were presented in such a manner as to create *575 turmoil, confusion and chaos within the Circuit."
It appears that in filing his petition and submitting to interviews by press representatives concerning it, Judge Kelly was seeking reconsideration by his fellow judges of his proposals as well as explaining to the public his side of the disagreement which had resulted in a majority of the judges in the circuit requiring him to resign as presiding judge, to which post they had elected him. In his petition, he sought to justify certain changes he had inaugurated as presiding judge in the procedural and administrative work in the circuit, as well as certain proposals he had submitted to his fellow judges to achieve alleged reforms in handling the judicial work of the circuit. He set forth in his petition criticisms of certain conditions in the circuit which he alleged were detrimental to good judicial administration.
By filing the petition he appears to have followed the tradition of free citizens who having suffered the smart of official demotion or public censure make public their side by way of explanation or justification. If, for example, the grand jury of the county censured him, he would be within his rights to make some reply or defense if he desired. No doubt certain quiet-souled judges, upon being similarly displaced as was Judge Kelly and seeing their hopes for certain judicial reforms evaporate, would have resignedly accepted the situation without murmur; but it was not constitutionally required that Judge Kelly follow a like course. Each man's reaction or rejoinder to frustration or provocation conceivably will differ in kind or degree.
The Judicial Qualifications Commission concludes Judge Kelly's related action was motivated by personal vanity to bolster his public image and to revenge himself upon some of his colleagues who had disagreed with him and required him to resign as presiding judge of the circuit. I am unable to agree. I am constrained to believe the Commission's finding reaches too deeply into the psychological motivation of the Judge in a very nebulous, debatable area. It would be just as easy to infer his motivation was confined to an explanation and justification of his views on court reform and was designed to enlist public support for his proposals without vindictiveness or malice. Aside from psychological considerations, the external trappings or methods of his response to his colleagues' demotion of him appear not to be abusive, contumacious, malicious, or rancorous, and at any rate were permissible in law under the First Amendment privilege.
I believe Judge Kelly had an untrammeled right to publicly explain his side of the disagreement with certain of his judicial colleagues; petition or appeal to his colleagues for reconsideration; and seek public understanding and support of his proposed reforms. Since a majority of his judicial colleagues brought about his removal as presiding judge, he had a kind of "qualified privilege," to borrow a phrase from the law of libel, to publicly explain his side of the affair in moderate, unmalicious, and unabusive language. Certainly he, a judge periodically subjected to the elective process to retain his judgeship, had cause to feel aggrieved by the turn of events that affected his public stature or figure and in the constitutional scheme of free expression could seek a reconsideration by his colleagues as well as justify to the public his side of the affair and did not have to stand mute under the circumstances merely because he is a judge. Further, Section 23 of Rule A, "Ethics Governing Judges," authorizes judges because of their judicial experience to advise "those having authority to remedy defects of [judicial] procedure" of the results of their observation and experience as a contribution "to the public interest." This Judge Kelly did in his petition to his fellow judges, who are authorized to submit local court rules changes to this Court for approval.
I do not find from the record that his public reaction to his colleagues' demotion of him was either malicious, abusive, profane, *576 contumacious, arrogant, or hostile, or that it passed beyond the bounds of judicial decorum or good taste. It did not descend into rancorous personality or verbal impropriety. He made no personal attack on any of his fellow judges nor did he in anywise impugn the character of any of them, although he incidentally criticised their judgment in disagreeing with his proposed reforms.
Underlying the charge of which the Commission found him guilty is the impact caused by the attention given his petition in the local press. Moreover, although the Commission claims its inquiry was not concerned with the "content" of the petition, its brief somewhat inconsistently implies that Judge Kelly's criticisms are not protected against reprisal because the criticisms are not "constructive." Obviously, the Commission's recommendations proceed upon the theory that the contents of the petition allegedly embarrassed the other judges of the Sixth Circuit and lowered the image of that Court. I do not believe his fellow judges should have been so sensitive to the attendant publicity since news reporting in areas of public interest is a fact of life. The Commission should realize also no cloak of immunity can shroud the judiciary from interventions of the press.
This is not the first case in American jurisprudence involving public criticism of the judiciary. Other courts have clearly set out the boundaries within which critics must remain. Fortunately for our democratic society, these boundaries are wide.
Before any man may be punished for speech in a newspaper critical of the courts, the record must show that his criticism has created a clear and present danger of disrupting the administration of justice. Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1946); Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1945); Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). Disruption of the administration of justice is shown by evidence that a particular party to litigation has been prejudiced, that the outcome of a trial has been influenced or that a petit jury has been affected; Wood v. Georgia, supra.
With respect to a judge's sensitivity to newspaper criticism, the United States Supreme Court has stated:
"Judges are supposed to be men of fortitude, able to thrive in a hardy climate." Craig v. Harney, supra, at 331 U.S. 376, 67 S.Ct. 1255.
[Newspaper criticism] * * * "may influence some judges more than others. Some are of a more sensitive fiber than their colleagues. The law deals in generalities and external standards and cannot depend on the varying degrees of moral courage or stability in the face of criticism which individual judges may possess * * *." Pennekamp v. Florida, supra, at 328 U.S. 348, 66 S.Ct. 1038.
Furthermore, the effectiveness of such criticism is immaterial when the question is whether the criticism is to be punished:
"Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations." New York Times Co. v. Sullivan, 376 U.S. 254, 273, 84 S.Ct. 710, 722, 11 L.Ed.2d 686 (1962).
Judge Kelly unquestionably had the right to speak publicly on a matter so fraught with public concern as the administration of the courts in the Sixth Judicial Circuit without incurring judicial sanctions, even if his petition was incidentally critical of his fellow judges. As the United States Supreme Court observed in Pickering v. Board of Education, 391 U.S. 563, 570, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968):
"[T]o the extent that the Board's position here can be taken to suggest that even comments on the matters of public concern that are substantially correct *577 * * * may furnish grounds for dismissal if they are sufficiently critical in tone, we uneqivocally reject it."
The truth may not be punished, either criminally or civilly. Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Moreover, even if Judge Kelly's criticisms of official conduct in the Sixth Judicial Circuit were in error factually and were defamatory (a matter not charged against him), Judge Kelly would remain protected by the constitutional guaranty of free speech, so long as there has been no finding that his statements were knowingly false or made with reckless disregard of their truth or falsity. Pickering v. Board of Education, supra; New York Times Co. v. Sullivan, supra; Garrison v. Louisiana, supra; St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).
It is clearly unconstitutional to require any man to present his ideas to official authorities for their prior consideration and approval. Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1964). It is equally unlawful to threaten an individual with loss of public employment for exercising his constitutional right to speak out on matters of public concern. Pickering v. Board of Education, supra. Consequently, in order that Article V, Section 17A of the Florida Constitution may be compatible with the First and Fourteenth Amendments to the United States Constitution, it must not be permitted to censor free expression.
Tragic implications could result from the precedent of discipline of Judge Kelly for speaking out on the need for court reform. The people of Florida will suffer if their judges must restrict their public statements to uncritical banalities in order to avoid the threat of similar sanctions. The right to disagree with others in matters of governmental policy is one of the cherished rights of American citizenship. It cannot be watered down by a board of censors or subjected to the possibility of sanctions that make its exercise a fearful prospect. The courts exist to serve the people. If the courts are not operating as efficiently as is humanly possible, then the people have the right to hear this from the individuals who are best able to tell them  the judges.
If the First Amendment does not protect a judge's right to speak in circumstances such as these, then we are bound to have in Florida a timorous lot of judges lacking independence, afraid of their judicial shadows, and fearful to exercise conscientiously the right to speak out in favor of judicial reform.
I do not believe the reach of the Code of Ethics Governing Judicial Conduct can be construed to deny Judge Kelly his privilege of speaking out under the related circumstances or that in doing so he violated the code. In the setting in which he exercised his right to speak he had certain inherent privileges, if not a duty to seek judicial reform. In the context within which he spoke, we note: He is a judge in a multijudge circuit (there are twelve incumbent Circuit Judges in the 6th Circuit); in fact, until removed, he was the duly elected presiding judge. Such a circuit, with multiple judges, in the matter of division of the judicial labor therein alone involves many administrative and procedural problems which reasonably could be the concern of any of the circuit judges justifying him to suggest changes and reforms. Judge Kelly, a judge elected by the people, had advocated certain things he considered would reform and improve the judicial machinery of his circuit. As presiding judge, he put into effect some of the changes he advocated. For his pains in seeking changes, whether correct or misguided, he was relieved of his status as presiding judge and undoubtedly suffered diminution of public stature. At this juncture he attempted by petition to get his fellow judges to reconsider and he sought to explain to the public his side of the affair and appealed for public support in behalf of the changes he proposed and the reforms he alleged were necessary. I do not find that what he did or sought to do passed beyond the bounds of judicial decorum or good behavior, or publicly *578 trespassed upon those hallowed precincts of the judiciary which, according to some, can only be entered into with propriety in secret conclave with the priesthood of fellow judges and such matters as Judge Kelly raised there discussed, but never in the "sunshine" of lay publicity. Moreover, I think he had First Amendment protection for what he did.
Second, the other matters charged against Judge Kelly are equally without redeeming merit. There was much rehash of old charges of judicial intemperance and arrogance against Judge Kelly concerning his alleged conduct in court and his alleged hostility and mistreatment of certain attorneys. Many of these charges previously went down the drain and were not vindicated in early legislative impeachment attempts against him or were based on incidents transpiring before the adoption of Section 17A of Article V, under which the Commission functions.
Numerous witnesses, including nineteen lawyers, three bailiffs, three court reporters, twenty-four jurors, overwhelmingly refuted various facets of the charges. Most of the charges emanated from disgruntled court personnel. Testimony by witnesses to his courtroom conduct establishes Judge Kelly as a competent and temperate judge. Trial lawyers of statewide and national reputations and jurors testified he was fair to all litigants and courteous to attorneys and jurors and made well-considered rulings.
There was no substantiation by competent evidence that the Judge was mentally or emotionally irrational and the Commission did not so find.
Judge Kelly admits to being somewhat of a reformer, particularly in the judicial area  a trait which is often suspect by those who cling to the status quo. However, this trait, even if displeasing to lovers of ancient or outmoded forms, ought not be equated with irrationality or mental instability.
More than sixty-five witnesses, including two physicians, testified the Judge had never manifested any form of irrationality, even upon tense circumstances.
I conclude no clear and convincing showing substantiates the second charge.
In summation, I think this is a regrettable inquiry that probably ought never to have been pursued. The Commission should have been extremely cautious in launching an inquiry in the sensitive area of an elected official's inherent right to function in the sphere of free expression.
There is every reason why a corrupt, senile, insane, venal or obviously vindictive judge should be subjected to inquiry. So should one whose conduct is so habitually gross it clearly passes beyond the bounds of traditional and well-recognized judicial decorum or whose lack of a becoming judicial demeanor or whose arrogance obviously reaches the point of habitual intemperance. The Commission can unquestionably discipline in those areas of judicial conduct. But here the Commission in its very first inquiry essayed to venture into a very nebulous and debatable situation involving the psychological motivation of a judge and in the process equated his right to speak out on the subject of judicial reform as the prime example of his unbecoming conduct and bad behavior.
By so venturing, we have at our threshold for the first review of findings of the Commission, issues that set at stake the most fundamental concepts of a free democratic society.
The Commission brings into question the right of an elected judge to speak publicly on matters of public concern and the right of the people of this state to be informed of the administration of an important function of their government. The courts of this country have jealously guarded these rights against encroachments of all kinds.
Central to this democratic process is access to accurate information, for without *579 this information the people cannot exercise their control of government.
Judge Kelly, a knowledgeable judicial officer with several years' experience on the bench, as a part of his effort to obtain what he considered to be judicial reform in his circuit, told the public what he felt they needed to know about the administration of a vital arm of government. By filing his petition in furtherance of his proposed changes, Judge Kelly sought reconsideration by his fellow judges and supplied information upon which he expected the people to make a judgment concerning his disagreement with his fellow judges about the needs he alleged were essential for court reform. Petition filing is constitutionally "established procedure" in this country for presenting information and recommendations relative to matters of governmental policy to affected officials and in the bargain may appeal to the public for consideration and support. It is a method that has never been constitutionally condemned, since it is one of the principal elements of the democratic process. It would be unfortunate to excise from the democratic process the troublesome willingness of a judge to publicly make known his feelings about court reform.
Woven throughout the fabric of these proceedings is a disturbing question: Under what conditions may the elective process be nullified by the discipline or removal of elected judicial officials? The question is a disturbing one because in a democratic society the people's elected officials should not be disturbed in their tenure except in instances of great aggravation.
This question has never emerged in sharp focus in these proceedings but is present nonetheless. Undoubtedly, most thoughtful people who have come into contact with this case are troubled by it. Everyone would undoubtedly agree that the corrupt, the senile, and the insane have no place in the judiciary and that the people of this state, whose votes approved Article V, Section 17A of the Constitution, reasonably believed that the Commission would discipline any members of the judiciary who were corrupt, senile or insane. However, there is no showing in the record before this Court that Judge Kelly is corrupt, senile, or insane. The question then recurs whether he was blatantly and maliciously guilty of habitual intemperance or unbecoming judicial conduct. Was his judicial conduct habitually gross and abusive?
Judge Kelly did criticise the manner in which the circuit was being operated. In so doing he "rocked the boat," and annoyed some of his fellow judges, who professed to being embarrassed by the attendant publicity. For this, the Commission has recommended that he be punished. From this recommendation the question arises whether the people of this State knew when they voted on Article V, Section 17A, that the Judicial Qualifications Commission would proceed against a judge who spoke publicly of the need for court reform.
I glean from the record that Judge Kelly appears to believe in popular control of government and efficient courts. He believes he has a duty to inform the people about inefficient conditions in their courts. He admits he so informed the people. Judge Kelly submits, however, that speaking out on a matter of such public concern today as the efficient administration of the courts is an exercise of his constitutional rights and fulfillment of a positive duty and is not habitual intemperance or unbecoming judicial conduct. I am constrained to agree with him because I believe his speaking out in the premises is constitutionally guaranteed.
I would dismiss the charges against him.
LARKIN and LaMOTTE, Circuit Judges, concur.