646 So.2d 173 (1994)
In re Inquiry Concerning a Judge No. 93-353 re Mary Jean McALLISTER.
No. 82855.
Supreme Court of Florida.
October 13, 1994.
Rehearing Denied December 19, 1994.
*174 Joseph J. Reiter, Chairman, and Ford L. Thompson, Gen. Counsel, Tallahassee, Lauri Waldman Ross, Sp. Counsel, Maland & Ross, and Timothy W. Ross, Timothy W. Ross, P.A., Sp. Counsel, Miami, for petitioner.
Martin Errol Rice, Martin Errol Rice, P.A., St. Petersburg, for respondent.
PER CURIAM.
The Florida Judicial Qualifications Commission (Commission) recommends that this Court discipline Judge Mary Jean McAllister through removal from office for conduct that demonstrates her present unfitness to hold judicial office in the state. We have jurisdiction. Art. V, § 12(f), Fla. Const. For the reasons expressed below, we approve the Commission's recommendation.
Judge McAllister was elected as County Court Judge in and for Pinellas County, Florida in 1992 and took office in January, 1993. On December 6, 1993, the Commission charged Judge McAllister with six (6) counts of misconduct.[1] After a formal hearing was conducted before the Commission, the Commission found Judge McAllister not guilty of the charges in Counts I, III and VI, and guilty of Counts II, IV, and V. These latter counts allege that: (1) Judge McAllister engaged in improper ex parte communications with the State concerning matters before her; (2) Judge McAllister displayed a lack of judicial impartiality by being abusive towards attorneys in the Public Defender's Office; and (3) Judge McAllister sexually harassed her judicial assistant and maintained an abusive and hostile work environment.
In support of its recommendation, the Commission made the following findings of fact:
3. In February 1993, Judge McAllister started making numerous sexual remarks to Phyllis Worobey [her judicial assistant]. These remarks included improper comments on Worobey's legs and breasts, her figure, and her sex life. Judge McAllister also told Worobey about her own personal life, mentioning that she had a female friend like her (referring to Judge McAllister) who liked women, and discussed a pool party at which her female friends sat around in the nude.
4. Phyllis Worobey testified that Judge McAllister asked her to go to lunch every day, and that when she made plans to lunch with others, the Judge told her to cancel her other plans.
5. Phyllis Worobey further testified that the Judge invited her out for drinks after work on numerous occasions, and to attend a judicial conference with her.
6. Phyllis Worobey testified that she attempted to dress more conservatively and that she began making excuses about lunch, in order to discourage the Judge's attentions. She declined the other invitations.
7. As a result of Judge McAllister's conduct, Phyllis Worobey felt deeply embarrassed and humiliated, and resigned from her position on August 23, 1993.

*175 8. John Hudzietz is an assistant public defender assigned to the Public Defender's Office in Pinellas County, Florida. During his three years with the Public Defender's office, he received excellent reviews from his supervisors and appeared before numerous judges, who had no complaints about his conduct. Mr. Hudzietz' assignment to Division L preceded Judge McAllister's election to the bench and he remained in her division thereafter.
9. Shortly after her election, Judge McAllister privately expressed a strong personal dislike for public defender Hudzietz, and made numerous comments in pejorative terms reflecting on his character, skill and ability. As to Judge McAllister's treatment of him, Mr. Hudzietz testified that his appearance in court became "a show" attended by numerous attorneys and court personnel, all of whom watched while he was berated. Judge McAllister made disparaging comments about his ability to practice law and the advice he was rendering to his clients... .
10. On July 22, 1993, Judge McAllister presided in the case of State v. Constantino, handled by Mr. Hudzietz, which trial resulted in a guilty verdict. Judge McAllister imposed a sentence of 60 days jail time. The following day, July 23, the public defender's secretary Linda Melvin phoned the Judge's chambers to set a supersedeas bond hearing. Judge McAllister initially refused to hold any hearing; then instructed her judicial assistant to set it a month down the road. Judge McAllister did not agree to an earlier date until her judicial assistant warned her that this "might come back to haunt [her]". Judge McAllister instructed her judicial assistant to give the public defender's office two dates some ten to fourteen days in the future and to tell them that these were the first dates available. At the time Judge McAllister gave these instructions, the information was untrue. Judge McAllister had earlier dates available on her calendar.
11. As instructed by Judge McAllister, her judicial assistant called the public defender's office and told Linda Melvin that the next available hearing dates were August 3 and August 6, 1993.
12. Dissatisfied with the dates received from Judge McAllister's chambers, public defender McMillan filed a petition for writ of habeas corpus. That petition was heard by the criminal administrative Judge, Brandt C. Downey, III on July 27, 1993, who routinely heard habeas matters. Judge Downey denied the petition, but set a supersedeas bond.
13. Judge McAllister contacted two circuit judges, Judge Downey and Judge Susan Schaeffer, questioning the public defenders' conduct and the procedure that they had used in filing the petition. Judge Downey testified that Judge McAllister was upset at the public defenders for "going over her head or behind her back". Both judges explained to Judge McAllister that the public defenders had acted appropriately.
14. On July 28, 1993, three assistant state attorneys were summoned to Judge McAllister's chambers by the Judge to discuss the Constantino case. No public defender was given notice or was present during the discussion which took place between the Judge and the State. At a bond revocation hearing that same day, Judge McAllister accused the public defenders of going over her head and acting in a "devious" manner based on ex parte information she received from the State... .
15. On August 5, 1993, at approximately 8:30 a.m., Judge McAllister called the case of State v. Turner, Civil 92-81962TRASP for trial. Public defender Hudzietz moved to continue the trial on the basis that the defender was in a felony trial that morning. The State voiced no objection and the cause was continued to September 2.
16. Some two and one-half hours later, Judge Schaeffer (to whom the Turner felony case was assigned) continued the felony case and re-set it for trial on September 2, 1993. State v. Turner, Case No. CRC 93-03797-CFANO. The new felony trial date was selected by Judge Schaeffer together with the felony assistant state attorney Evan Brodsky and assistant public defender, Craig LeValley. The fact that both *176 cases were re-set for September 2 was nothing more than a coincidence.
17. On August 6, 1993, Judge McAllister instructed her judicial assistant to summon the two assistant state attorneys associated with the Turner misdemeanor case to meet with her in chambers. This meeting took place behind closed doors. Once again, no public defender was noticed or attended this meeting. Judge McAllister instructed the attorneys to investigate the possibility of collusion or misrepresentation by public defender Hudzietz [in the Turner case]. Following that meeting Judge McAllister told her judicial assistant that "You might as well go ahead and write the letter to the Bar. Mr. Hudzietz is history."
18. On August 9, 1993, public defender Hudzietz appeared at a motion calendar before Judge McAllister on three pending cases. Judge McAllister asked Hudzietz to approach the bench and informed him that she had received information from the state that he had made misrepresentations to her and had colluded with the Turner felony public defender. Hudzietz insisted that the assistant state attorney be summoned and that a record of the proceedings be made. A transcript of the hearing reflects that the Judge disclosed her ex parte communication the prior Friday but attributed the accusations to the state, rather than revealing her own role in initiating the investigation. When Judge McAllister demanded an explanation regarding his conduct, public defender Hudzietz specifically denied making any misrepresentations or having any advance knowledge of the disposition of the felony case. Hudzietz left the courtroom unsure of what the Judge had required, and based on his supervisor's instructions ordered a copy of the transcript. That transcript did not arrive in the public defender's office until late on August 17, 1993.
19. On August 11, 1993, public defender Hudzietz defended Larry Hoad at trial. The Judge lost all appearance of impartiality during the trial; she screamed at public defender Hudzietz, berated the defendant on the stand and threatened the defendant with contempt no less than three times. The transcript of the trial indicated Public Defender Hudzietz did nothing at trial to warrant such treatment.
20. On August 12, 1993, Judge McAllister's judicial assistant received a phone call regarding the Turner case from one of the investigating state attorneys. It was indicated that they "couldn't find any sound evidence that John Hudzietz has lied in the case." Judge McAllister's judicial assistant gave the Judge the message. Judge McAllister nevertheless decided to hold a contempt hearing regarding Hudzietz' alleged conduct and gave the State Attorney's office advance notice that it was going to take place. Judge McAllister gave neither Mr. Hudzietz nor anyone else in the public defender's office similar advance notice.
21. On the morning of August 18, 1993, Mr. Hudzietz arrived in Judge McAllister's courtroom and announced ready for trial in State v. Boccio, Case No. 92-21069MMANO. Immediately upon his arrival, Judge McAllister announced that she was having all of Hudzietz' cases administratively transferred, and cited Hudzietz for direct criminal contempt "for making a purposeful, intentional misrepresentation to the Court concerning (Turner's) availability for trial on September 2, the continued trial date." Judge McAllister informed Hudzietz that she would hear any evidence of "mitigating or excusing circumstances." At the time Judge McAllister made these pronouncements, at least four attorneys from the misdemeanor section of the state attorneys office were present to observe the contempt hearing. Mr. Hudzietz requested and received an adjournment to notify a supervisor and obtain representation.
22. During the adjournment, Judge McAllister saw County Judge Patrick Caddell in the hall and told him that she couldn't stand Hudzietz and was "going to get him."
23. Three assistant state attorneys and four public defenders appeared before Judge McAllister on August 18 to explain that Hudzietz had done nothing wrong, and that the scheduling problem in Turner *177 was a mere coincidence. Judge McAllister refused to accept this explanation. Although the witnesses agreed that Mr. Hudzietz had neither made misrepresentations nor engaged in collusion, the court nevertheless insisted on a public apology. Mr. Hudzietz testified that he apologized because he was certain that the alternative was jail.
(References to transcript omitted.)
On these facts, the Commission concluded that Judge McAllister should be found guilty of violating Code of Judicial Conduct Canon 1 (a judge should uphold the integrity and independence of the judiciary), Canon 2 (a judge should avoid impropriety and the appearance of impropriety in all his activities), Canon 3A(1) (a judge should be faithful to the law and maintain professional competence in it), Canon 3A(3) (a judge should be patient, dignified, and courteous), Canon 3A(4) (a judge should not engage in or consider ex parte communications) and 3C(1)(a) (a judge should disqualify himself in a proceeding in which his impartiality might be questioned).
Based on these factual findings and conclusions of law, the Commission found that Judge McAllister's conduct demonstrates her present unfitness to hold judicial office in this state. Consequently, it recommended that Judge McAllister be removed from her position as Judge of the Pinellas County Court.[2]
"The findings and recommendations of the Judicial Qualifications Commission are of persuasive force and should be given great weight. However, the ultimate power and responsibility in making a determination rests with this Court." In re LaMotte, 341 So.2d 513, 516 (Fla. 1977) (citation omitted). Before reporting findings of fact to this Court, the Commission must conclude that they are established by clear and convincing evidence. Id. It is this Court's responsibility to review the Commission's findings and ascertain whether they are supported by clear and convincing evidence. See id. Our review of the record of the proceedings before the Commission reveals that its findings of fact are supported by clear and convincing evidence. Therefore, this Court concludes that Judge McAllister is guilty of the three charges in Counts II, IV and V.
Judge McAllister contends that even if this Court accepts the Commission's findings, removal is not warranted. To support her contention that removal is not warranted Judge McAllister cites a number of decisions. See In re Perry, 641 So.2d 366 (Fla. 1994) (public reprimand given for judge's unnecessary admonishment of army recruiter who appeared in court in his army dress uniform and for judge's abuse of his contempt powers); In re Trettis, 577 So.2d 1312 (Fla. 1991) (judge's stipulation for public reprimand approved); In re Sturgis, 529 So.2d 281 (Fla. 1988) (Court imposed public reprimand for judge, who, inter alia, participated in ex *178 parte communications, continued practice of law, displayed handgun while presiding at proceedings and accepted Commission's recommendation of public reprimand); In re Lantz, 402 So.2d 1144 (Fla. 1981) (Court declined to remove judge for repeated instances of arrogance and lack of courtesy in light of repentance and rehabilitation of judge); In re Kelly, 238 So.2d 565 (Fla. 1970) (public reprimand given for multiple claims of abuse of office), cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971).
The Court finds that these cases are not dispositive. Standing alone, each individual charge against Judge McAllister, while extremely serious in nature, might not warrant the extreme disciplinary measure of removal. However,
[c]onduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents, which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary.
In re Kelly, 238 So.2d at 566; see also State ex rel. Turner v. Earle, 295 So.2d 609, 621 (Fla. 1974) (Ervin, J., dissenting) ("Pec[c]adillos of a judge should be ignored by the Commission unless they cumulatively reflect upon the present quality of his judicial service or render him an object of disrespect and derision in his role to the point of ineffectiveness."). Moreover, a judgeship is a position of trust, not a fiefdom. Litigants and attorneys should not be made to feel that the disparity of power between themselves and the judge jeopardizes their right to justice. In re Graham, 620 So.2d 1273, 1277 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1186, 127 L.Ed.2d 537 (1994).
We conclude that the findings of sexual harassment of a judicial assistant, a willingness to engage in ex parte communications and the intentional abuse directed toward the public defender's office, when viewed together, warrant removal. The conduct detailed in the Commission's findings is fundamentally inconsistent with the basic responsibilities of judicial office.
Accordingly, for the reasons expressed, we approve the findings and recommendation of the Commission. We direct that Mary Jean McAllister be removed as County Court Judge in and for Pinellas County, Florida effective upon this opinion becoming final.
It is so ordered.
GRIMES, C.J., and SHAW, KOGAN, HARDING, WELLS and ANSTEAD, JJ., concur.
OVERTON, J., is recused.
NOTES
[1] The Commission charged that: (1) Judge McAllister instructed her judicial assistant to report to her the substance of any attempted ex parte communications, rumors, courthouse gossip or the like that she received or heard in and around the Pinellas County Court Complex; (2) Judge McAllister had improper ex parte communications with the State concerning matters before her, including but not limited to the case of State v. Constantino, Case No. 92-17851MMANO; (3) Judge McAllister showed a lack of judicial impartiality to those whom she perceived to be political opponents by sua sponte striking a juror in the Constantino case because he was her political opponent's campaign manager; (4) Judge McAllister displayed a lack of judicial impartiality by being abusive towards attorneys in the Public Defender's Office; (5) Judge McAllister sexually harassed her judicial assistant and maintained an abusive and hostile environment; and (6) Judge McAllister was derelict in the performance of her judicial duties by frequently and unilaterally cancelling matters pending on her calendar and attending to matters in an untimely fashion.
[2] In paragraph 26 of the Commission's findings, the Commission refers to Judge McAllister's "lack of veracity." The details of the Commission's findings regarding Judge McAllister's "lack of veracity" are set out in paragraph 24:

24. During this four-day trial [before the Commission] the Commission observed Judge McAllister testifying for hours. The pattern was always the same. First she testified that facts existed which she perceived to be in her own best interests. Then, when confronted with documentary evidence to the contrary, Judge McAllister would change her position. By changing her testimony repeatedly during the trial Judge McAllister indicated time and time again that she had no regard for the truth. The clear and convincing evidence demonstrates that she gave testimony to the Commission that she knew was [sic] to be false.
In light of our decision in In re Davey, No. 82,328, slip op. at 17, 645 So.2d 398, 405 (Fla. Oct. 13, 1994), we disapprove the Commission's use of Judge McAllister's lack of veracity as a basis for discipline. In Davey, we have adopted a three-step guideline that must be followed to use lack of candor as a basis for the reprimand or removal of a judge. "First, only where lack of candor is formally charged and proven may it be used as a basis for removal or reprimand... . Second, discipline based on lack of candor may be imposed only where the Commission makes particularized findings on specific points in the record... . [Third,] the lack of candor must be knowing and willful." Id. at 18-20, 405-07. Our decision to remove Judge McAllister is not based, to any degree, on the Commission's findings in paragraph 24. Rather, it is based only on the charges formally brought against Judge McAllister.