620 So.2d 1273 (1993)
In re Inquiry Concerning a Judge, re: Gary G. GRAHAM.
No. 80273.
Supreme Court of Florida.
June 24, 1993.
*1274 Joseph J. Reiter, Chairman, Ford Thompson, Gen. Counsel, and Roy T. Rhodes, Sp. Gen. Counsel, FL Judicial Qualifications Com'n, Tallahassee, and Terrance A. Bostic and Alicia J. Schumacher, Bush, Ross Gardner, Warren & Rudy, P.A., Sp. Counsel to FL Judicial Qualifications Com'n, Tampa, for petitioner.
Gary G. Graham, pro se.

CORRECTED COPY
PER CURIAM.
We have for review the Judicial Qualifications Commission's (JQC) finding that Judge Gary Graham demonstrates a present unfitness to hold office and its recommendation that he be removed from office. We have jurisdiction pursuant to article V, section 12 of the Florida Constitution. We approve the JQC's findings and recommendations and remove Graham from the office of county judge.
Graham was elected as the county court judge for Citrus County in 1986 and has served in that position since taking office in 1987. On August 7, 1992, the JQC formally charged Graham with the following violations of canons 1, 2, and 3(A)(1) of the Code of Judicial Conduct:
1. Repeatedly using his position as judge of the Citrus County Court to make allegations of official misconduct and improper criticisms against fellow judges, elected officials and their assistants, and others, without reasonable factual basis or due regard for their personal and professional reputations.
2. Exceeding and abusing the power of his office by imposing improper sentences and improper use of contempt power.
3. Acting in an undignified and discourteous manner toward litigants, attorneys, and others appearing in his court.
4. Acting in a manner which impugned the public perception of the integrity and impartiality of the judiciary.
5. Closing and attempting to close public proceedings.
The JQC made numerous factual findings to support its conclusion that Graham's cumulative conduct is unbecoming a member of the judiciary and demonstrates a present unfitness to hold office. Although the JQC's report fully explains the nature of each particular incident involving Graham's misconduct, we mention only a few of the factual findings that typify his behavior and tend to erode the public's confidence in the judiciary.
Graham presided in a case in which the defendant was charged with being a passenger in a vehicle in possession of an open container of alcohol. Graham suspended his driver's license for six months. When the defendant questioned the fairness of the sentence, Graham increased the suspension to nine months and then asked if the defendant wanted the court to reconsider the sentence. When the defendant responded "yes sir," Graham increased the suspension to one year. We agree with the JQC that Graham's arbitrary increase in sentencing in this instance constituted an improper abuse of power.
Graham also served as the presiding judge in a case in which he sentenced the defendant to six months in jail for spray painting vulgar graffiti on public property. In open court, the mother of the defendant questioned the fairness of the sentence. Graham addressed the mother, stating, "You know what his problem is, his problem is you. It is not me. It is you. I can tell by the way you are defending him." Graham then engaged courtroom personnel and spectators in a highly inappropriate colloquy that would be embarrassing to any reasonable person, particularly the defendant's mother. He needlessly utilized vulgar and offensive language and, in doing so, demonstrated a severe lack of judicial temperament.
*1275 In another case in which Graham presided, the defendant was convicted of driving under the influence of alcohol. When Graham sentenced the defendant, he also took that opportunity to accuse the sheriff's office of improperly releasing the defendant on his own recognizance as an act of favoritism. Graham stated that a ten-day sentence would have been appropriate but for the defendant's "improper" release on his own recognizance. As punishment for the "improper release," Graham then sentenced the defendant to ninety days in the county jail. He refused to mitigate the defendant's sentence and told the defendant "That's what you got for trading favors to get out of the Citrus County jail." Although the defendant's sentence was within the legal range, Graham's comments clearly indicated that the length of the sentence was not based on the severity of the offense or on the defendant's criminal record, but on Graham's own allegations of political favoritism in the sheriff's office. His actions constituted an abuse of power and impugned the public's perception of the integrity and impartiality of the judiciary.
To impose any degree of discipline upon a judge, the evidence regarding the charges against him or her must be clear and convincing. In re LaMotte, 341 So.2d 513 (Fla. 1977). Although the findings of the JQC are of "persuasive force," In re Kelly, 238 So.2d 565, 571 (Fla. 1970), cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971), this Court is charged with rendering the ultimate decision on whether the evidence proves that Graham's conduct is unbecoming a member of the judiciary. The object of these disciplinary proceedings "is not to inflict punishment, but to determine whether one who exercises judicial power is unfit to hold a judgeship." Id. at 569. Regrettably, in his appearance before the JQC, in his brief, and in his oral argument to this Court, Graham only obliquely addressed the critical issue of his present fitness to serve as a judge. Instead, he focuses his arguments on the conduct of other officials, attorneys, and citizens of Citrus County. Regardless of whether his criticisms of these individuals and institutions are well-founded, they are not relevant to our determination of his ability to administer justice fairly and professionally.
As a county judge, Graham made what he perceived to be a valiant effort at ridding Citrus County of the political favoritism and government corruption that caused the demise of his predecessor. His zealous pursuit of a pure society apparently clouded his ability to impartially adjudicate the matters before him. His motives are acceptable, but his methods are not. Unfortunately, Graham fails to recognize that the alleged misconduct of others does not justify his repeated departure from the guidelines established in the Code of Judicial Conduct. "A judge's power to make orders exists solely by virtue of his or her function as an adjudicator; it does not extend beyond the performance of judicial duties." In re Eastmoore, 504 So.2d 756, 757 (Fla. 1987). To go beyond those duties, as Graham has done, amounts to an abuse of power that threatens the integrity of the judicial branch.
We recognize that Graham is not dishonest, venal, or guilty of moral turpitude. According to the constitution, though, "[m]alfides, scienter or moral turpitude on the part of justice or judge shall not be required for removal from office of a justice or judge whose conduct demonstrates a present unfitness to hold office." Art. V, § 12(f), Fla. Const. Judges are not obligated to adhere to a uniform mode of behavior and they are free to make decisions without fearing an investigation by the JQC. In re a Judge, 357 So.2d 172 (Fla. 1978). "Every judicial officer is granted broad discretionary powers, and one of the great strengths of our system is the carefully guarded right to exercise independently those powers." Id. at 178. But when diverting from common professional standards and judicial courtesies, a judge's conduct should be rationally based. The direct evidence in this case reveals that Graham's conduct was, at times, neither professional nor rational, and there was a clear abuse of judicial power to the detriment of individuals.
*1276 Graham argues that his right to due process was violated because he was given insufficient time to prepare his defense and because the JQC sat as both the prosecutor and the judge.[1] Procedural due process requires that a "judge be given notice of proceedings against him or her, that a judge be given an opportunity to be heard, and that the proceedings against a judge be essentially fair." In re Shenberg, 17 Fla. L. Weekly S217, S218, 1992 WL 63094 (Fla. April 2, 1992). Graham received notice of the investigation and was formally charged on August 7, 1992. The JQC hearing was held in January 1993, giving Graham approximately five and one-half months to prepare for the charges.
We reject Graham's contention that his right to due process was violated by the JQC's dual performance as fact-finder and judge. As the reviewing court, we are obligated to study the record and independently assess the factual findings and recommendation of the JQC. We conclude that the fact finding process was conducted according to the procedural rules of the JQC; that the JQC granted Graham an opportunity to be heard; and that the proceedings were essentially fair and afforded Graham his right to due process.[2]
Having approved the JQC's findings of fact, this Court is faced with the choice of publicly reprimanding Graham or removing him from the office of county judge. Art. V, § 12, Fla. Const. This Court will not lightly remove someone from judicial office. In re Berkowitz, 522 So.2d 843 (Fla. 1988). A judge who refuses to recognize his own transgressions does not deserve the authority or command the respect necessary to judge the transgressions of others. We are troubled by the fact that Graham shows no remorse and we can only presume that if this Court reprimanded him, he would continue to violate the precepts of the Code of Judicial Conduct. See In re Trettis, 577 So.2d 1312 (Fla. 1991) (when a judge continuously acts in a manner that undermines public confidence, removal may be required).
Graham has provided a number of letters from citizens who support his efforts as a county judge and we realize that he has been popularly elected and reelected to his position. However, "if a judge commits a grievous wrong which should erode confidence in the judiciary, but it does not appear that the public has lost confidence in the judiciary, the judge should nevertheless be removed." LaMotte, 341 So.2d at 518. Because judges are held to a very high standard of conduct, In re Boyd, 308 So.2d 13 (Fla. 1975), they are frequently required to make some sacrifices that other individuals are not called to make. By accepting the privilege of serving as a judge and by taking the oath of office, Graham agreed to live and operate his courtroom by that high standard.
Standing alone, each individual charge against Graham might not warrant the extreme disciplinary measure of removal.
Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary.
Kelly, 238 So.2d at 566. Although some of the charges are more severe than others, Graham's cumulative conduct over a period of time and the totality of the circumstances compel us to consider extreme remedial action. "Pec[c]adillos of a judge should be ignored by the Commission unless they cumulatively reflect upon the *1277 present quality of his judicial service or render him an object of disrespect and derision in his role to the point of ineffectiveness." State ex rel. Turner v. Earle, 295 So.2d 609, 621 (Fla. 1974) (Ervin, J., dissenting). A judgeship is a position of trust, not a fiefdom. Litigants and attorneys should not be made to feel that the disparity of power between themselves and the judge jeopardizes their right to justice. In removing Graham from office, we rely on In re Crowell, 379 So.2d 107 (Fla. 1980). In Crowell, this Court removed the judge for abuse of contempt power and a pattern of hostile conduct that demonstrated a serious lack of judicial temperament.[3] Graham's conduct was similar in degree to Judge Crowell's and warrants the same discipline.
We approve the findings and recommendation of the JQC. Gary Graham is hereby removed from office without compensation effective upon the filing of this opinion, at which time a vacancy will exist on the Citrus County court.
It is so ordered.
BARKETT, C.J., and OVERTON, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
McDONALD, J., concurs in part and dissents in part with an opinion.
McDONALD, Judge, concurring in part, dissenting in part.
I agree that there is competent evidence to support the findings of fact of the commission. I further agree that Judge Graham's actions as found support the conclusion that on occasions he failed to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary as required by canon 1, Code of Judicial Conduct. He was not always courteous to people with whom he dealt in his official capacity as required by canon 3.
In assessing his fitness to hold office we should address the totality of his performance. None of his transgressions, standing alone, appear sufficient to make a determination that he is unfit. Collectively, he becomes suspect. Our evaluation, however, should not be limited to his ethical violations. Also thrown in the ratio must be the hours and the days where he properly functioned. We must also consider his intellect, his honesty, and other personal traits. Numerous tapes, both audio and video, indicate that for the most part and on most occasions he performed adequately as a judge.
One of Judge Graham's shortcomings is his view that his conduct was justifiable and for good cause without consideration of its effect on others. He explains his actions as that of one trying to clean up a decadent county court system. He fails to recognize that even though one's goal may be appropriate, the means employed to accomplish it must be within the canons of judicial ethics. I believe that some of his actions can be explained by judicial immaturity.
His conduct throughout the proceedings before the Judicial Qualifications Commission was deplorable. He feels that the entire proceedings against him were an extension of his political enemies and that the members of the commission became unworthy participants therein. He presented large amounts of irrelevant evidence, constantly challenged the chairman of the commission, made numerous unnecessary objections. It is unfortunate that he did not employ a skilled lawyer to advise and conduct the hearings for him, because the manner in which he participated in the proceedings could not have created a friendly feeling from members of the commission. See In re a Judge, 357 So.2d 172 (Fla. 1978).
*1278 We do not lightly remove a judge from office. Most removals have been the result of some act of dishonesty by the judge. No one claims, or even suggests, that Judge Graham is dishonest. The record supports his claim that he in fact is genuinely honest.
We reprimanded Judge Dick Lantz in In re Lantz, 402 So.2d 1144 (Fla. 1981), for conduct that appeared to me more egregious than that of Judge Graham. Judge Lantz acknowledged his transgressions while Judge Graham has not. We reprimanded Judge Richard Kelly for conduct which was quite similar to that of Judge Graham. In re Kelly, 238 So.2d 565 (Fla. 1970), cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971). We removed Judge Joseph M. Crowell for gross abuse of a judge's contempt power. In re Crowell, 379 So.2d 107 (Fla. 1979). Judge Crowell was also suffering from medical problems. Neither of these factors exist in Judge Graham's case.
I do not wish to minimize Judge Graham's transgressions, but I do not believe we can find that he is unfit to serve. Now that this Court has advised him of his errors, and with an appropriate reprimand delivered in open court by the Chief Justice, I believe he should be allowed to continue to serve for such time as he has been elected.
I would remind Judge Graham that judges are servants of the people in an unique way. We have huge power over the property and lives of many people. This power must be responsibly and reflectively utilized. All persons must be treated equally and impartially. A judge must not react in anger to any situation. At all times we must serve the public interest by promoting justice and avoid any impropriety or appearance thereof. Courtesy to all is an essential trait of a respected judge. We must not be swayed by partisan demands, public clamor, or considerations of personal popularity, nor apprehension of unjust criticism. A judge should be careful to assure that in every particular the judge's conduct should be above reproach. He should not use his office for political power or retribution against his detractors.
I believe these proceedings were necessary. I also believe that they are bound to have a therapeutic affect on the future conduct of Judge Graham and, hopefully, help steer other judges from like conduct.
Thus I would approve the factual findings of the commission and loudly and severely reprimand Judge Graham. I would not remove him from office.
NOTES
[1] We find it ironic that Graham now complains about the disciplinary process and the role of the JQC. Graham instigated the JQC to initiate disciplinary proceedings against Judge Leonard Damron. See In re Damron, 487 So.2d 1 (Fla. 1986).
[2] Our review of the transcripts and video tapes of the JQC hearing revealed that Graham repeatedly objected to motions, intentionally delayed the proceedings, and disregarded the instructions of the presiding chair. Although his performance during the JQC proceedings does not condemn him, it does reflect negatively upon his character. We are convinced that Graham would not have tolerated such behavior in his own courtroom.
[3] In In re Crowell, 379 So.2d 107 (Fla. 1980), the judge who was the subject of the disciplinary proceedings partially attributed his misconduct to medical problems. Graham offers no similar justification or mitigating reasons that might explain his actions. Graham's case is distinguishable from In re Lantz, 402 So.2d 1144 (Fla. 1981), in which Judge Lantz was publicly reprimanded. Although Judge Lantz was charged with repeated acts of arrogance and displaying a lack of courtesy and dignity to litigants and lawyers, he confessed his misdeeds, apologized, and was rehabilitated.