PER CURIAM.
We review the recommendation of the Judicial Qualifications Commission (JQC) that respondent, Judge Gayle S. Graziano, be removed from her position as circuit court judge for the Seventh Judicial Circuit. Pursuant to article V, section 12(f) of the Florida Constitution,[1] we have jurisdiction. We have considered the record, respondent’s written response, and oral argument. For the reasons expressed below, we affirm the JQC’s recommendation.
Respondent was elected as a circuit court judge in 1986 and was elected Chief Judge of the Seventh Judicial Circuit in 1993. She was reelected to the position of Chief Judge in February 1995. On August 28, 1996, the JQC charged respondent with eight counts of violating the Florida Code of Judicial Conduct.[2] After a formal hearing was conduct *747 ed, the JQC found that respondent was not guilty of counts four, five, six, and portions of count eight. The remaining counts alleged that respondent: (1) influenced the decision to hire Ethel Rosa, a close personal friend and business associate of respondent, who was substantially less qualified than other applicants, for the job of Guardian Ad Litem Case Coordinator for Flagler County; (2) issued a written directive increasing Rosa’s hourly wage by approximately thirty-four percent despite reports of unsatisfactory job performance; (3) directed the transfer of Rosa from her part-time position to a full-time position, a directive which she later rescinded; (4) without speaking or explaining her actions to Judge Foxman, entered Judge Foxman’s courtroom in the middle of an evi-dentiary hearing, approached the court reporter, Jane O’Brian, and demanded that O’Brian move her car from respondent’s judicial assistant’s parking spot; and (5) used insulting or threatening language in several instances to court employees, including loudly berating Debbie Minton, the Court Operations Manager for Volusia County; threatening Tony Landry, an employee of the Clerk of Court, with “jail time”; and accusing Sharon Welch, Program Analyst for Volusia County, of taking the modem card from respondent’s office computer after Welch installed a network system into respondent’s computer.
The JQC filed its Findings of Fact, Conclusions of Law, and Recommendation on December 27, 1996. The JQC made the following findings of fact:
2.Gayle S. Graziano has been friends with Ethel Rosa since 1985 and, at times material to these charges, considered Ms. Rosa to be her “best friend.” In April of 1995, Ms. Rosa was either residing with Judge Graziano in New Smyrna Beach, or had recently moved from the New Smyrna residence to the condominium in Flagler Beach. (TR 59, 60, 61) Throughout all of 1995, Judge Graziano and Ethel Rosa owned property together, held by a corporation known as GAET, Inc. The letters GAET are the first two initials of Judge Graziano and Ethel Rosa’s names. (TR 62, 63) GAET, Inc. has owned condominiums in Daytona Beach and Flagler Beach. Later, the Flagler Beach condominium was transferred out of the corporation to Gayle S. Graziano and Ethel Rosa jointly, with joint right of survivorship.
3. In the spring of 1995, the Guardian Ad Litem Case Coordinator for Flagler County, Diane McNally, submitted her resignation and a job search was conducted for her replacement. (TR 67, 68, 498)
4. On April 25th or 26th, 1995, Judge Graziano handed Evelyn Bible, Senior Deputy Clerk for Volusia County, the resume of Ethel Rosa and requested Ms. Bible consider said resume for the position of Guardian Ad Litem Case Coordinator for Flagler County. (TR 319).
5. Prior to Judge Graziano’s interceding on Ms. Rosa’s behalf, a candidate for the position had been agreed upon by Linda Bennett, Circuit Director for the Guardian Ad Litem program for the Seventh Judicial Circuit, Diane McNally, and Evelyn Bible. (TR 317, 476, 501) Ms. Bible had completed an extensive scoring analysis of the applicants and the candidate selected, Michelle Orphen, received the highest score. Pursuant to Judge Gra-ziano’s instruction to consider Ms. Rosa for the position, her application was subsequently scored. Ms. Rosa did not receive a score higher than Ms. Orphen and additional points were added to her final score based upon Judge Graziano’s opinion that Ms. Rosa’s “connections” within the community were an asset. At the conclusion of the scoring, the original selected candidate, Ms. Orphen, still scored the highest. (TR 324, 325) (Commission Exh. 11)
6. In May, 1995, Ms. Bible expressed her concerns to Judge Graziano regarding her relationship with Ethel Rosa and Ms. Rosa being hired for the case coordinator position. Judge Graziano assured Ms. Bible that she would have a “hands-off’ poli *748 cy. (TR 326) Judge Graziano then went on to ask Ms. Bible, “May I tell Ethel tonight that she’s been selected?” (TR 828) Ms. Bible reluctantly replied in the affirmative. Ms. Bible thereafter directed Ms. Bennett to hire Ms. Rosa for the position. Ms. Bible directed the hiring of Ms. Rosa based upon Ms. Bible’s feelings that she was compelled to do so, and that she “had no choice” given Judge Graziano’s request. (TR 328, 329)
7. On November 9, 1995, Judge Grazi-ano wrote a letter to Christopher Chinault, County Administrator for Flagler County, directing Mr. Chinault to increase the Fla-gler County Case Coordinator position by $3.25 per hour, (Commission Exh. 4), amounting to a raise of approximately 34%.
8. On December 11, 1995, Judge Grazi-ano again wrote to Mr. Chinault, after Mr. Chinault’s expressed objections to increasing Ms. Rosa’s salary. This letter directed Mr. Chinault to transfer the funds from the judiciary discretionary budget in order to accomplish the judge’s directive. (Commission Exh. 5).
9. There were questions concerning Ms. Rosa’s qualifications for the position of Guardian Ad Litem Coordinator. Nevertheless, because of Judge Graziano’s intervention, Ms. Rosa was hired for the job. Once she assumed the position, there were problems with her performance. Katie Watkins, who became circuit-wide Guardian Ad Litem Director in January, 1996, testified to extensive problems in the Fla-gler County office which resulted from Ms. Rosa’s failure to follow the correct chain of command as far as supervision went; inappropriate demeanor to state attorney personnel, court reporters, and people associated with the court; inappropriate and ineffective supervision of guardians and the inappropriate presentation of ease work in court. (TR 330, 332, 512) At least one witness called by Judge Graziano acknowledged that problems were encountered in the Flagler County program under Ms. Rosa’s direction which had not been present under the direction of Ms. [Rjosa’s predecessor, Diane McNally. (TR 1020) Ms. Rosa’s annual evaluation completed in 1996 revealed a 35 out of a possible 100 available points. (TR 330, 331, 512), (Commission Exh. 12)
10. On April 30, 1996, Judge Graziano prepared a memorandum to Mark Weinberg directing him to transfer Ms. Rosa to the Family Law Coordinator position in Volusia County at a salary of $28,000.00. (Commission Exh. 7). The directive to transfer Ms. Rosa was made in spite of poor performance evaluations of Ms. Rosa in her present position, her lack of qualifications for the new position and concerns expressed directly to Judge Graziano by Katie Watkins, Guardian Ad Litem Circuit Director for the Seventh Judicial Circuit, that the transfer of Ms. Rosa was not in the best interest of the program, Ms. Rosa or the judge. (TR 519, 520, 521, 522, 523, 524, 525)
11. On February 11,1994, Judge Grazi-ano entered Circuit Judge James Fox-man’s courtroom through the judge’s private entrance while court was in session. At the time, Judge Foxman was presiding over a hearing on Motion to Suppress in the State v. Ashley matter. Assistant State Attorney Michael Politis was in the midst of his closing argument when Judge Graziano approached the court reporter, Jane O’Brian, and demanded to know if it was Ms. O’Brian’s red car parked in the judicial assistant’s parking space. When Ms. O’Brian confirmed it was her vehicle, Judge Graziano instructed her to move her vehicle immediately. Judge Foxman had to take a recess in order to allow the court reporter to move her vehicle. (TR 714) Judge Graziano did not seek or obtain Judge Foxman’s consent to this interruption in the proceedings over which he presided. (TR 672) Ms. O’Brian left the courtroom in tears. (TR 740)
12. On December 11, 1995, Judge Gra-ziano summoned to her chambers Court Operations Manager for Volusia County, Debbie Minton, and spoke in a loud and disparaging manner concerning the Clerk’s office. Judge Graziano was angry about a facsimile document that had not been faxed correctly. In spite of the fact that no specific directions were given by the *749 judge or her judicial assistant to the clerk who attempted to fax the document, Judge Graziano, in a raised voice, berated the Clerk’s office and stated the clerks were “incompetent, morons and idiots.” (TR 822, 823, 824), (Commission Exh. 15)
13. On February 5, 1996, Sharon Welch, Program Analyst for Volusia County, installed a network system into Judge Graziano’s office computer. Judge Grazi-ano was present during the first part of the installation process. (TR 280, 281) Two mornings later, when Judge Graziano was unable to access “American On-Line” services from her computer, (TR 133, 281, 282) Judge Graziano called Ms. Welch, extremely agitated that Ms. Welch had taken her modem card. Judge Graziano refused to listen to Ms. Welch’s denial that she had taken the modem card. The modem card was subsequently determined to be in the computer, precisely where Ms. Welch had tried to tell Judge Graziano it was. (TR 282, 283, 284)
14. Earlier this year, Judge Graziano in the presence of Tony Landry had a conversation with Diane Matousek, Clerk of Court for Volusia County regarding a memorandum Mr. Landry had circulated as to the judiciary. (TR 301, 302, 806) In response to several inquiries from other judges, Mr. Landry had circulated a memorandum explaining the status of certain projects the clerk’s office had been doing in order to provide networking to all the judiciary. (TR 299, 300) As a result of the memorandum, Judge Graziano told Ms. Matousek that “if Mr. Landry does anything like that again, Mr. Landry will find himself in jail.” (TR 301, 302, 806)
15. Judge Graziano called at least ten character witnesses in her defense, including lawyers, court personnel and circuit judges for the Seventh Judicial Circuit who gave positive evaluations of Judge Grazi-ano’s performance as a circuit judge. Judge Graziano was frequently described as a “tough but fair” judge who demanded a high level of performance from attorneys who appeared before her. Most, if not all, of these witnesses denied ever seeing Judge Graziano behave in an abusive or arrogant manner or in any fashion attempt to embarrass any attorney, litigant or court personnel who appeared before her.
16. Several witnesses called by Judge Graziano praised her for her extensive, positive contributions to her community, especially her involvement in juvenile justice issues.
17. During the trial Judge Graziano testified at length on two separate occasions, first as an adverse witness for the Commission and second as a witness on her own behalf. The Commission had ample opportunity to observe and evaluate her testimony and demeanor on the stand. Judge Graziano either would not or could not recognize that there was a violation of the Code of Judicial Conduct or that there was any impropriety in her actions of using her judicial office to cause the hiring of her best friend, housemate and business partner to a job within the judicial system. Likewise, Judge Graziano did not see even the appearance of impropriety in her subsequent efforts, by direct judicial order, to obtain a raise or promotion for Ms. Rosa. Throughout her testimony Judge Graziano was evasive and made contradictory and inconsistent statements and answers. While the Commission realizes that memories are not infallible, that details can be forgotten, and that there are often some discrepancies in testimony at hearings and trials, there appeared to be many discrepancies and conflicts in Judge Graziano’s testimony before the Commission.
18. Judge Graziano previously agreed to a stipulated reprimand by the Supreme Court of Florida. In an opinion dated October 19, 1995 in 661 So.2d 819 (1995), Judge Graziano was given a public reprimand for issuing a warrant for the arrest of a witness who had not been served with a subpoena. The witness was arrested and handcuffed in front of attorneys at an important conference on the death penalty in Key West and returned to Daytona Beach although he was supposed to go with his family for a vacation to Europe. The Respondent was also reprimanded for failing to be patient, dignified and courteous to litigants, lawyers and other[s] with whom she dealt in her official capacity.
*750 19. The Commission, by an affirmative vote of not less than nine members, finds that there is clear and convincing evidence that Judge Graziano is guilty of Counts I, II, III, VII and that portion of Count VIII relating to the Debbie Minton, Sharon Welch and Tony Landry charges.
20. The charges in this case show a pattern of improper judicial conduct which continued even after the Respondent received a public reprimand by the Florida Supreme Court. This pattern demonstrates an abuse of power exacerbated by someone who held the position of chief judge. The Respondent continues to show an inability or refusal to distinguish right from wrong. She has made no change in her conduct since receiving the prior public reprimand and there is nothing to indicate that another public reprimand would result in any change. The persistent actions of Judge Graziano demonstrate a willful disregard of the Code of Judicial Conduct. Such conduct dictates a recommendation of removal.
21. Less than nine members of the Commission found there was clear and convincing evidence to find Judge Graziano guilty of Counts IV, V, VI and the remaining portion of Count VIII, and these Counts and the remainder of the County [sic] VIII are dismissed.
With this factual predicate, the JQC concluded that respondent was guilty of violating the following canons of the Code of Judicial Conduct. With respect to counts one, two, and three, involving the hiring and subsequent efforts to obtain a raise and promotion for Ethel Rosa, the JQC found respondent acted in direct violation of Canon 3 (a judge shall perform the duties of judicial office impartially and diligently).[3] With respect to count seven and the portions of count eight which respondent was found guilty of violating, the JQC found respondent acted in direct violation of Canon 1 (a judge shall uphold the integrity and independence of the judiciary), Canon 2 A (a judge shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), Canon 3 B(4) (a judge shall be patient, dignified, and courteous to all persons with whom the judge deals with in an official capacity), and Canon 3 B(5) (a judge should perform judicial duties without bias or prejudice). The JQC specifically rejected respondent’s explanation of the events for which she was found guilty.
Based on these factual findings and conclusions of law, the JQC concluded that respondent’s pattern of injudicious behavior, inability to recognize the impropriety of her actions, and lack of veracity demonstrated a present unfitness to hold judicial office. Accordingly, the JQC recommended that respondent be removed from her position as circuit judge for the Seventh Judicial Circuit.
In this Court, respondent raises three issues. In her first issue, respondent claims that the JQC violated its own rules so that respondent was deprived of due process of law. Procedural due process requires that a judge be given notice of the proceedings, that the judge be given an opportunity to be heard, and that the proceedings against the judge be essentially fair. See In re Graham, 620 So.2d 1273, 1276 (Fla.1993); see also Fla. Jud. Qual. Comm’n R. 16(a). Additionally, due process requires the JQC to be in substantial compliance with its procedural rules. In re Inquiry Concerning a Judge, 357 So.2d 172 (Fla.1978). After reviewing the record and applicable law, we find no merit to any of these claims.
First, respondent asserts that the JQC violated her due-process rights in improperly taking nineteen witness statements prior to the filing of the notice of investigation. Eleven of these statements were not given under any oath, and eight were not given under oath administered by a member of the JQC.[4] See Fla. Jud. Qual. Comm’n R. *751 3(b) (in any matter within JQC’s jurisdiction requiring appearance of any person before JQC or any member, any member of JQC has power to administer oaths to such persons). Respondent claims this violated Florida Judicial Qualifications Rule 24(c), which states that every witness in every proceeding shall be sworn to tell the truth. Consequently, respondent asserts that in the absence of sworn testimony, there was no basis for formal charges. We do not agree that rule 24(c) is applicable or requires only sworn statements in the JQC’s preliminary investigation. Rule 6 applies to investigations, and rule 6 does not require that all statements be sworn.
Likewise, we do not agree with respondent’s contention that her rights were violated when the JQC denied her access to the minutes of the meetings wherein the JQC determined that it would issue a notice of investigation and notice of formal charges. Respondent claimed these minutes were necessary to determine whether the notices were based upon unsworn or improperly sworn statements from witnesses. Respondent’s assertion is fundamentally flawed because, as we have stated, there is no requirement that statements obtained in the JQC’s investigation be sworn. Moreover, these minutes were from hearings in the investigation stage. Pursuant to article V, section 12(d) of the Florida Constitution,[5] as implemented by rule 24(a), the proceedings by or before the JQC are confidential until the JQC[6] files formal charges with the clerk of this Court. We have explained that confidentiality allows the JQC to process efficiently complaints from any and all sources while protecting the complainant from recriminations and the judicial officer from unsubstantiated charges. See Forbes v. Earle, 298 So.2d 1, 4 (Fla.1974). Although in Forbes we confronted a procedure under which the records of the proceedings before the JQC were not disclosed until after a recommendation of removal, we find the rationale germane to the current confidentiality requirements of the JQC’s investigation. Cf. Fla. Jud. Qual. Comm’n R. 6(b) (judge has no right to be present or to be heard during investigation). Accordingly, we find this issue to be merit-less.
In a similar claim, respondent also asserts that her constitutional rights to due process and cross-examination were violated when she was denied access to the original written complaint filed by Judge Kim Hammond. However, under article V, section 12(d), Florida Constitution, and the Florida Judicial Qualification Rules, the original complaint is a confidential document. See Fla. Jud. Qual. Comm’n R. 24; Fla. Jud. Qual. Comm’n R. 6(b). For the policy reasons expressed above, the continuing confidentiality of the initial complaint furthers the interests of both the public and the judiciary. In addition, the JQC has balanced the requirements of confidentiality of the original complaint by providing for discovery in Florida Judicial Qualifications Commission Rule 12. Rule 12(b) provides:
Counsel shall, upon written demand of a party or counsel of record, promptly furnish the following:
The names and addresses of all witnesses whose testimony the Counsel expects to offer at the hearing, together with copies of all written statements and transcripts of testimony of such witnesses in the possession of the counsel or the Commission which are relevant to the subject matter of the hearing and which have not previously been furnished. When good cause is shown this rule may be waived.
Although not allowing for discovery of the complaint itself, discovery pursuant to rule 12(b) allows an accused judge to have full access to the evidence upon which formal charges are based. The policy reasons for the confidentiality of the original complaint clearly outweigh any benefit the discovery of *752 it could have in view of the discovery right provided by rule 12. In this case, respondent took full advantage of the discovery allowed by rule 12. Accordingly, we find this contention without merit.
We also find meritless respondent’s contention that the JQC violated rule 12(a) by not having a complete pretrial conference pursuant to Florida Rule of Civil Procedure 1.200(c). The record does reflect that a pretrial conference was noticed on October 28, 1996, to be held on November 6, 1996, and the conference was held on that date. We agree with respondent that the pretrial hearing notice was not in accord with rule 1.200(c). However, respondent has failed to demonstrate how the failure to provide the twenty-day notice required by rule 1.200(c) prejudiced her. Likewise, there is simply no basis to find that what respondent asserts were deficiencies in the pretrial conference which was ordered prejudiced her in respect to the hearing on the charges.
Respondent also claims that the JQC violated Florida Rule of Civil Procedure 1.470(b) (“Instructions to Jury”). We find this rule to be inapplicable to a hearing on formal charges before the JQC.
Respondent next claims that the JQC violated due process in ruling and disposing of motions without notice of a hearing itself. The actual claim is that the JQC’s motion committee ruled on the basis of written submissions without oral argument. Florida Judicial Qualifications Commission Rule 9(b) empowers the motion committee to dispose of all pretrial motions and does not require oral argument before disposing of these motions. We find no violation of the JQC’s rules or due process in respect to the consideration of these motions.
Respondent claims error in respect to the quashing of two witness subpoenas: one for Mark Weinberg and one for a newspaper reporter John Holland. We have carefully reviewed the record in respect to this claim and find that the JQC was within its discretion in quashing these subpoenas. Furthermore, respondent has failed to demonstrate any prejudice from the quashing of these subpoenas. Next, we consider and find no merit to the contention that respondent’s due-process rights were prejudiced by the JQC’s ruling on a motion in limine, in which the JQC precluded questioning of any witness about alleged improprieties by. judges other than respondent. We find the information sought in respect to other judges was beyond the scope of permissible inquiry in this proceeding.
Additionally, respondent contends that her due-process right to confidentiality was violated when several newspaper articles detailing the facts of the investigation were published prior to the initiation of formal charges against her. The JQC does not dispute that the newspaper reports contained confidential information. We agree with respondent that the JQC must provide reasonable safeguards against any breaches of the confidentiality requirements by itself, its staff, and its counsel. In this ease, the source of the disclosed information is unknown. We find no basis to conclude that there was a breach of the JQC’s obligation of confidentiality in respect to the JQC, its staff, or its counsel being the source of the information in the newspaper articles. Moreover, as we earlier noted, the confidentiality requirements promote the effectiveness of the judicial disciplinary process and protect judicial officers from unsubstantiated charges. The due-process concern involved with respect to the confidentiality requirement is whether the reported information prejudiced respondent’s rights to a fair hearing. We do not find that the fairness of the hearing or the JQC’s recommendations were affected by the reported information.
In the final due-process claim, respondent contends that rule 6(b) is unconstitutional in that it prevented her from presenting testimony or other evidence at the preliminary determination of whether probable cause existed to initiate formal charges. We have previously addressed and rejected similar contentions. See, e.g., In re Kelly, 238 So.2d 565, 570-71 (Fla.1970) (due process is met when one is given notice of proceedings and an opportunity to be heard, and proceedings are essentially fair). Further, we reject the contention that due process *753 was violated because the JQC was the decision-maker in both the preliminary determination of the existence of probable cause and the final determination of the formal charges. In re Graham, 620 So.2d 1273 (Fla.1993). As the reviewing court, we are obligated to study the record and independently assess the factual findings and recommendations of the JQC. Id. at 1276.
In her second general issue, respondent challenges the JQC’s findings of fact. Before reporting findings of fact to this Court, the JQC must conclude that they are established by clear and convincing evidence. In re McAllister, 646 So.2d 173, 177 (Fla.1994). This Court must then review the findings and determine whether they meet this quantum of proof, a standard which requires more proof than a “preponderance of the evidence” but the less than “beyond and to the exclusion of a reasonable doubt.” In re Davey, 645 So.2d 398, 404 (Fla.1994). If the findings meet this intermediate standard, then they are of persuasive force and are given great weight by this Court. See In re LaMotte, 341 So.2d 513, 516 (Fla.1977). This is so because the JQC is in a position to evaluate the testimony and evidence firsthand. See In re Crowell, 379 So.2d 107 (Fla.1979). However, the ultimate power and responsibility in making a determination rests with this Court. Id.
Based on our independent review of the record, we find the JQC’s findings supported by clear and convincing evidence. We do note that the JQC specifically rejected respondent’s denial regarding any employment decision concerning Ms. Rosa; her claim that she entered Judge Foxman’s courtroom at the invitation of the judge; and her explanation of the exchanges between Ms. Minton, Ms. Welch, and Mr. Landry. We find that there is clear and convincing evidence to support the JQC’s determinations. Therefore, we conclude that respondent is guilty of counts one, two, three, seven, and that portion of count eight relating to charges involving Debbie Minton, Sharon Welsh, and Tony Landry.
In light of these findings, we now turn to the appropriate sanction for the misconduct. Removal is the ultimate sanction in judicial disciplinary proceedings. We approve recommendations from the JQC that a judicial officer be removed when we conclude that the judge’s conduct is fundamentally inconsistent with the responsibilities of judicial office. McAllister. We agree with the JQC that respondent’s conduct in respect to the various incidents involving Ms. Rosa’s employment were inconsistent with the responsibilities of judicial office. These actions were the rank misuse of respondent’s judicial office for her personal reasons in violation of Canon 3. Such misuse of judicial office results in reducing the public’s trust of judicial officers. The judicial system cannot provide the service required of it without public trust of judicial officers.
In respect to the other charges which were supported by clear and convincing evidence, standing alone these charges may have been found not to warrant the sanction of removal. However, these charges do not stand alone. These charges not only stand with the charges concerning Ms. Rosa but also stand with respondent’s previous disciplinary charges, which we found warranted a public reprimand, see In re Graziano, 661 So.2d 819 (Fla.1995), and with a specific finding that respondent has demonstrated an inability to recognize the impropriety of her actions and that respondent demonstrated a lack of veracity in her dialogue with the JQC in respect to these charges. We conclude that the JQC’s findings that respondent, by conducting herself as set out in the findings of fact along with her earlier conduct warranting a public reprimand, has demonstrated a pattern of injudicious behavior for which the appropriate sanction is removal from judicial office.
Accordingly, we approve the findings and recommendations of the JQC. Gayle S. Grazi-ano is hereby removed as circuit court judge for the Seventh Judicial Circuit of Florida effective upon this opinion becoming final.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, HARDING, WELLS and ANSTEAD, JJ., concur.
GRIMES, J., recused.
*754 ORDER
The Court has withdrawn from its opinion the statement that no motion for rehearing will be allowed. A motion for rehearing maybe filed in accordance with the Florida Rules of Appellate Procedure.
Respondent is suspended as of this date and shall perform no further acts as a circuit judge. Respondent’s removal shall be effective when this decision becomes final.
Respondent’s request for a stay is denied.

. The 1995 version of the Florida Constitution is applicable to these proceedings.

. The JQC charged that respondent: (1) influenced the decision to hire Ethel Rosa, a close personal friend and business associate of respondent, who was substantially less qualified than other applicants, for the job of Guardian Ad Litem Case Coordinator for Flagler County; (2) issued a written directive giving Rosa an hourly wage increase despite reports of unsatisfactory job performance; (3) directed the transfer of Rosa to a full-time position, a directive which she later rescinded; (4) directed the rewriting of a job description in order that Patricia Ferraro, a friend of respondent, would be more qualified for the position; (5) approached a law clerk, Richard Lawhom, pointed a gun at his head, and asked why he completed a research project for another judge before completing an earlier assignment for herself; (6) called the Department of Corrections to speak with the supervisor of a witness in State v. Pinardi, a matter over which respondent was presiding, to express her disappointment with the testimony; (7) without speaking or explaining her actions to Judge Foxman, entered Judge Foxman’s courtroom in the middle *747 of an evidentiary hearing, approached the court reporter, Jane O’Brian, and demanded that O’Brian move her car from Graziano’s judicial assistant’s parking spot; (8) engaged in a persistent practice of using inappropriately harsh, insulting, embarrassing, and threatening language toward numerous court employees in public and private settings.

. Included among the provisions of Canon 3 are the directives that a judge should diligently discharge the judge’s administrative responsibilities without bias or prejudice, see Fla.Code Jud. Conduct, Canon 3 C(l), and that a judge should not make unnecessary appointments and shall exercise the power of appointment impartially and on the basis of merit, see Fla.Code Jud. Conduct, Canon 3 C(4).

. Of these eight statements, seven were taken after the oath was administered by special coun *751 sel, and one was taken after the oath was administered by a paralegal.

. Under the current version of the constitution, the relevant provision is article V, section 12(a)(4); however, the requirement that until formal charges are filed against a justice or judge, all proceedings before the JQC are confidential remains intact.

. Under the current version of the constitution, formal charges are filed by the investigative panel. See art. V, § 12(a)(4),(5), (b), Fla. Const.