PER CURIAM.
We have for review the findings and recommendations of a hearing panel of the Florida Judicial Qualifications Commission, recommending that Judge Steven P. Shea be removed from his position of circuit court judge for the Sixteenth Judicial Circuit. We have jurisdiction. Art. V, § 12, Fla. Const. For the reasons expressed below, we affirm the hearing panel’s findings and recommendation.
Judge Shea took office as a circuit court judge in January 1995. On April 30, 1998, the Judicial Qualification Commission (JQC) filed a “Notice of Formal Charges” in this Court, alleging various violations of the Code of Judicial Conduct. The charges were amended to include six general prefatory charges and thirty-seven specific charges. The prefatory charges alleged that Judge Shea abused the power of his judicial office by engaging in a pattern of vindictive and retaliatory conduct towards those who disagreed with him. This conduct included: publicly holding the disagreeing party up to scorn and ridicule; launching unilateral investigations of the party’s conduct and character; issuing self-serving orders that distorted the facts; airing petty grievances publicly in order to embarrass the parties; being verbally and physically abusive to others; and showing disrespect for fellow judges in his circuit and encouraging others to do the same.
At the end of its case-in-chief, the JQC voluntarily dismissed twelve of the specific charges, stating that no evidence was presented on these charges. Subsequently, the hearing panel found that six other charges were not supported by clear and convincing evidence. The hearing panel did find Judge Shea guilty of the conduct charged in the prefatory charges, except that it did not find that Judge Shea was physically abusive towards others. The charges found by the hearing panel to be supported by clear and convincing evidence are summarized as follows: (1) Judge Shea improperly contacted two attorneys and intimidated these attorneys into withdrawing from representation of their client by threatening to recuse himself from all of their cases; (2) Judge Shea entered an order directing a litigant to show cause why she should not be held in indirect criminal contempt for writing a letter to the Governor complaining of Judge Shea’s handling of her support case; (3) Judge Shea improperly sought to hold a counselor of Upper Keys Guidance Clinic in contempt and threatened to put the Clinic out of business; (4) Judge Shea limited the rights of pro se petitioners with domestic violence complaints by requiring employees of the Domestic Abuse Shelter to submit affidavits that stated that they did not furnish any assistance to the petitioners, chilling the willingness of victims *633 and staff to come forward with legitimate claims. Judge Shea falsely stated in a letter to a newspaper that the staff of the shelter agreed to the use of these forms; (5) Judge Shea engaged in a pattern of antagonism with court staff and other judges; (6) Judge Shea independently investigated a bailiff by interviewing a witness concerning the bailiff without notice to the bailiff and without counsel on his behalf, intending to release the information to a newspaper; (7) Judge Shea slammed a door in a bailiffs face; (8) Judge Shea inappropriately criticized a bailiff; (9) in a capital case, Judge Shea entered an order improperly implying that two attorneys were guilty of unethical conduct without allowing an opportunity to respond and threatening that he would refer any failure of counsel to comply with his directives to the Chief Justice of this Court; (10) Judge Shea denied a proper motion for recusal and then entered an order improperly and inaccurately criticizing defense counsel without affording them an opportunity to respond; (11) Judge Shea improperly suggested that attorneys in a domestic violence case were encouraging their client to disobey his orders by filing motions for a stay and improperly found the client to be in contempt; (12) Judge Shea falsely accused an assistant state attorney of attempting to make ex parte contacts with him and threatened to report him to The Florida Bar; (13) Judge Shea falsely accused an assistant state attorney of having stated that Judge Shea had engaged in ex parte communications; (14) Judge Shea improperly sought to involve third parties in an internal dispute concerning court administrative matters by publicly disseminating his version of events; (15) Judge Shea verbally attacked fellow judges in a regular meeting of the judges; (16) Judge Shea violated the confidence of another judge by disclosing the contents of a confidential memorandum; and (17) Judge Shea threatened to assess attorney fees against the Clerk of the Circuit Court.
The hearing panel concluded that Judge Shea had violated canons 1, 2, 3, and 5 of the Code of Judicial Conduct and set forth extensive factual findings in support of its conclusion that Judge Shea is unfit to hold office. While these findings fully explain the nature of each particular incident involving Judge Shea’s misconduct, we find that charge one of the specific charges to be such a substantial offense that it alone is sufficient to warrant Judge Shea’s removal from the bench.
The hearing panel’s findings as to charge one are as follows:
With regard to Charge 1, the Panel finds that clear and convincing evidence demonstrates guilt based upon the following events:
The Keynoter is an “Upper Keys” newspaper of general circulation. On Saturday, October 18, 1997, an article appeared in the Keynoter discussing Coral Key Village (a well-situated tract on which trailers are located pursuant to oral individual annual leases) and the fact that Nicholas W. Mulick, (“Mulick”) an Islaraorada, Florida, (“Upper Keys”) lawyer, was representing the new owners of Coral Key Village. (T. 2462).
As of that date, Judge Shea, who had been on the bench for approximately ten months, owned two trailers located on Coral Key Village lots. According to Judge Shea, he read the article and noted that “Mr. Mulick was quoted as representing my landlords, who were evicting me ... and it really surprised me.... ” (T. 2446). Judge Shea added that he “was surprised to see that ... two attorneys who were very good friends of mine who appeared in my court all the time were involved in this eviction.” (T. 2446).
Immediately after reading the article, Judge Shea called Mulick at his home at 9:00 or 10:00 a.m. on a Saturday. (T. 85; 2462). According to Mulick, Judge Shea told him that he had attempted to reach Mr. Peterson, a Tallahassee lawyer also representing the new owners, by telephone, but finding him out of town, left a *634 message for him and then called Mulick because his name was in the article. (T. 86). According to Mulick, Judge Shea asked him if he knew that he (the Judge) owned two mobile homes “because he thought that if I knew that, I wouldn’t be involved in the case.” (T. 86; 2463). Mulick informed Judge Shea that he was not involved in any eviction proceedings, that they were being handled by Mr. Peterson, and that he had only been consulted in connection with land-use matters. (T. 86; 2464).
According to Judge Shea, he “explained to Mulick that they can’t even evict us unless they get the land-use changed under Chapter 723” and that “if you’re working on the land-use ... that’s an essential, integral part of the eviction.” (T. 2464-65). Judge Shea continued, saying “It all goes hand in hand basically” and that he thought “we’d be — to me, we’d be at odds.” (T. 2465).
According to Mulick, Judge Shea then indicated that “he thought that because I was representing Coral Key Village that I was adverse to his interests and that if we did not recuse or withdraw from representing the client, he would have to recuse himself on all cases where we appeared attorney of record.” (T. 87). Mulick told Judge Shea that “we shouldn’t be talking about this, that he should talk to Mr. Peterson because he was involved in the eviction matter and not I.” (T. 87).
According to Mulick, Judge Shea then stated that if the owners of Coral Key Village were to buy him out, that would render the issue moot, and he would not have to withdraw. (T. 89).
Mulick testified that Judge Shea suggested that the buy-out price on the smaller lot was $50,000.00, with the buyout price on the more desirable lot being $100,000.00. (T. 89). Judge Shea admits to telling Mulick that “my places are worth up to $150,000.00,” but denied saying “give me $150,000.00 and I’m out of here,” stating, instead, that he suggested that Mulick’s client “buy everybody out ... and then he can own all the trailers there, and he can leave them there, or he can do what he wants.” (T. 2477; 2479).
A short time later, Judge Shea called Karl Beckmeyer, (“Beckmeyer”) Mu-lick’s law partner. (T. 154). Judge Shea asked him if he represented Coral Key Village, to which Beckmeyer responded that he thought Mulick was doing some land-use work for the new owners. (T. 154). Judge Shea then reminded Beckmeyer that he (Judge Shea) owned trailers in Coral Key Village, followed by the statement that “you’re adverse to my economic interest.” (T. 155).
Beckmeyer farther testified that Judge Shea spoke in a threatening manner and told him that if his law firm continued to represent the client, he was going to recuse himself from all of their cases, forcing them to go to Marathon and Key West for all of their hearings and trials. (T. 155). According to Beckmeyer, he was “dumbstruck.” (T. 155).
When asked whether upon reading the October 18, 1997, Keynoter article it was clear to him that Beckmeyer and Mulick were representing the owners of Coral Key Village, Judge Shea said that it was, and that such representation created a definite conflict between him and Beckmeyer and Mulick. (T. 2902-03). Judge Shea said he called, however, because he felt that “Nick and Karl must not understand that there’s a conflict here” ... “because [he] was under the impression they were very happy practicing in the Upper Keys; they weren’t dissatisfied with [him].” (T. 2903). He then decided to “disclose this conflict to them because it is a conflict, it’s a problem.” (T. 2903).
It was then suggested that Judge Shea’s call was to “straighten out a conflict,” and did he not see an impropriety *635 in doing so, to which he responded that he did not remember using the words “straighten out a conflict.” (T. 2904). However, the record reflects that during the Rule 6(b) hearing on the charges, Judge Shea had testified that he had called Beckmeyer’s office “and I said, ‘Karl,’ I said, ‘We need to straighten this out, because there’s going to be a conflict of interest for me to hear your cases if you’re suing me or if I’m suing you and you’re representing the other side.’” (T. 2822).
In closing, Judge Shea was asked whether his calls to Mulick and Beck-meyer “might be viewed as a veiled threat or a show of muscle by a member of the judiciary, [and] would it not have been the better practice to wait until the first case came ... before [him] — and at that time say, “I’m going to recuse myself’ in open court and let them decide what to do there, rather than a private phone call?” (T. 2906). In response, Judge Shea stated that is what he should have done, rather than what he did. (T. 2906).
Following the contact by Judge Shea, Beckmeyer and Mulick felt that they had no choice but to terminate their representation of Coral Key Village. (T. 95).
While the Panel makes no finding as to whether the actual amounts sought by Judge Shea were “exorbitant,” it is noted that Judge Shea called his judicial assistant, Lee El Koury, as a witness on his behalf and she testified she overheard a conversation between Judge Shea and Nick Mulick during which Judge Shea “said a sum of money.” (T. 1432; 1434). According to Ms. El Koury, Judge Shea “said $150,000.00.” (T. 1435). Following the telephone conversation, Judge Shea then told Ms. El Koury that he thought that the waterfront trailer was worth “about $75,-000.00,” or $25,000.00 less than what he had represented to Mulick. (T. 1436).
It is of further interest to the Panel in evaluating witness credibility that Judge Shea acquired his former wife’s interest in the waterfront lot in December of 1995, approximately two years before conveying to Mulick the $100,000.00 price. (T. 2901). When asked how much he had paid his former wife for her interest, he stated that “We had a mortgage on it of $40,000.00 ... and I paid off that mortgage, and that’s what I paid for that.” (T. 2901). He then conceded that as one-half of the mortgage was, theoretically, his responsibility, he effectively paid her $20,000.00 for her interest. (T. 2901). He did state that they had an “informal agreement” that if he ever sold the place, she would get “whatever equity she would be entitled to.” (T. 2901). However, when his attention was called to earlier testimony where he stated that he wanted to retire on the property (rather than sell it) he said “I’d like to live there eventually, right.” (T. 2902).
All of this testimony raises serious questions surrounding the actual fair market value of the property, the believability of Judge Shea’s statements in this regard and his underlying thought processes and intentions. The testimony shows a representation of a fair buyout value on the more expensive lot of $100,000.00 to Mulick, but a contemporaneous statement to Ms. El Koury that it was worth “about $75,000.00.” The testimony also reveals the Judge’s purchase of his ex-wife’s interest two years earlier by simply satisfying a mortgage of which only $20,000.00 was attributable to her, coupled with a questionable statement that when he eventually sold it, she would receive her share of the equity. However, the Judge seemed to contradict that testimony by stating that he intended to retire on it rather than sell it. (T. 2902).
The Panel also heard evidence from Mr. Rosendale who was Judge Shea’s appraisal expert. Mr. Rosendale testified to a value of $141,000.00 and to *636 Judge Shea’s involvement in the real estate appraisal he presented at the trial. (T. 1323 and Ex. 12).
Mr. Rosendale prepared an appraisal of the mobile homes and arrived at a value of $141,000.00. (T. 1323). Judge Shea did not own the lots where the trailers were parked and had only oral leases with the park owner. (T. 1322). The effective date of the appraisal was November 30, 1997, because Judge Shea told Mr. Rosendale that he received his eviction notice on December 1, 1997. (T. 1338). In fact, Judge Shea received his notice of eviction in October, or before the effective date used in the appraisal. (T. 1335). The erroneous information on which the appraiser relied came directly from the Judge. (T. 1338). In addition, Judge Shea had actually prepared the prospectus for the mobile home park during the time he was a lawyer, and he failed to inform Mr. Rosendale that he had only an oral one-year lease for the land. (T. 1342-3). This information would have affected the appraisal’s outcome. (T. 1340-41). The Panel has given Judge Shea the benefit of the doubt as to whether his conduct with regard to his own appraiser was deliberately misleading and has thus refrained from finding that Judge Shea was intentionally seeking an inflated amount. Notwithstanding, the conflicting evidence surrounding the value of the property raises serious questions about the credibility of Judge Shea’s testimony and contemporaneous intentions in response to Charge 1.
Based upon the clear and convincing evidence, as reflected above, and the reasonable inferences in connection therewith, the Panel concludes that Judge Shea is guilty in the following respects:
The contact with Mulick and Beck-meyer was improper and motivated by Judge Shea’s own personal financial interests and his desire to effect the removal of two well-respected attorneys from the representation of a party that he perceived as an enemy. In this regard, he abused his office and intimidated counsel into withdrawing from the representation of their client, the new owner of Coral Key Village. (T. 92; 155; 158; 159). The effect of this was to wrongfully, and without justification, deprive the owners of Coral Key Village of counsel of their choice. Judge Shea should not have threatened to recuse himself from all cases in which these lawyers were engaged in the representation of other clients. The telephone calls, regardless of his perceived friendship, were totally improper, as was the suggestion of a buy-out, whether made only for his own property or for his and other owners’ properties. The use and abuse of the power of his office in this regard is readily apparent and unacceptable.
As already stated, the Panel makes no finding as to whether the actual amounts sought by Judge Shea were “exorbitant.” The facts, however, do raise serious questions as to what happened, why it happened, and the underlying motives. Similarly, although it is not found that Judge Shea made threats to sue the owners while he was a judge or that he used the actual words, “Chicago Mafia,” it is found that Judge Shea did tell Mulick that the purchasers of Coral Key Village had a poor reputation, were dishonest businessmen from Chicago and “had acted in bad faith from the very beginning....” (T. 88; 2492). These comments are just further evidence of Judge Shea’s attempt to come between Mulick and Beckmeyer and their client. These were unsolicited and improper comments.
It is not suggested that Judge Shea could not have recused himself in particular cases in which Mulick or Beckmeyer might have appeared if he found the necessity to do so. However, this should have occurred in the context of an actual case and without the suggestion of a trade-off by giving counsel the *637 option of discontinuing their representation and having Judge Shea remain in all of the firm’s cases. His direct contacts with these counsel outside the context of any particular case were influenced by his own financial interests and were improper.
When Judge Shea made these phone calls to the law firm, it is absolutely clear from the evidence that he knew there was a pending eviction action as to the mobile home park and that this lawsuit may have rendered his trailers worthless because he did not own the land on which the trailers were parked. Judge Shea had only an informal oral lease on the land.
In sum, Judge Shea violated Canons 1 and 2 of the Code of Judicial conduct by his actions which were dishonorable and improper and did not promote public confidence in the integrity of the judiciary. Although Judge Shea had every right to protect the value of his property, the Panel concludes that he wrongly used his judicial office to promote his own financial interests.
In In re Graziano, 696 So.2d 744 (Fla.1997), we stated the following in respect to our review of the JQC’s findings of fact:
Before reporting findings of fact to this Court, the JQC must conclude that they are established by clear and convincing evidence. In re McAllister, 646 So.2d 173, 177 (Fla.1994). This Court must then review the findings and determine whether they meet this quantum of proof, a standard which requires more proof than a “preponderance of the evidence” but the less than “beyond and to the exclusion of a reasonable doubt.” In re Davey, 645 So.2d 398, 404 (Fla.1994). If the findings meet this intermediate standard, then they are of persuasive force and are given great weight by this Court. See In re LaMotte, 341 So.2d 513, 516 (Fla.1977). This is so because the JQC is in a position to evaluate the testimony and evidence first-hand. See In re Crowell, 379 So.2d 107 (Fla.1979). However, the ultimate power and responsibility in making a determination rests with this Court. Id.
Id. at 753.
Judge Shea admits that he called the attorneys and stated that if they did not withdraw from representing their clients or if their clients did not buy out the trailers, Judge Shea would recuse himself from all of their cases. In addition, one of the attorneys testified that Judge Shea discussed his recusal “in a very threatening manner.” The record also reflects that, while not admitting that he threatened the attorneys, Judge Shea did admit that during the discussions it was understood that his recusal would create an inconvenience for the attorneys because they would have to try their cases in Marathon or Key West. The record demonstrates that Judge Shea used the situation to compel the attorneys to attempt to obtain a buy-out of his trailers at an inflated price. The record contains clear and convincing evidence of Judge Shea’s attempts to improperly use his judicial office for financial benefit.
The hearing panel concluded that Judge Shea’s conduct as to charge one violated canons 1 and 2 of the Code of Judicial Conduct. Canon 1 states that “[a] judge shall uphold the integrity and independence of the judiciary.” Canon 2 provides that “[a] judge shall avoid impropriety and the appearance of impropriety in all of the judge’s activities.” We agree that Judge Shea’s conduct as established in the record violated these canons. Our decision is not to be read to indicate that Judge Shea’s recusal from a case in which these attorneys were involved would have been improper. What was plainly a violation of the Code was Judge Shea’s bargaining in respect to a recusal decision. Judge Shea made it clear to the attorneys that they could either withdraw from representing their clients or have their clients purchase the trailers to avoid his recusal. Such bargaining was an improper use of his *638 judicial office to gain a personal financial benefit and was a breach of the integrity of the judiciary. We agree with the hearing panel that such a breach of judicial integrity can in no way be tolerated.
In addition to canons 1 and 2, the hearing panel found that Judge Shea’s conduct as to the remaining charges also violated canons 3 and 5 of the Code of Judicial Conduct. Canon 3 B(4) provides that “[a] judge shall be patient, dignified, and courteous” to those he or she deals with in an official capacity. Canon 5 A. requires a judge to “conduct all of the judge’s extrajudicial activities so that they do not ... demean the judicial office.” Judge Shea argues that his conduct as to the remaining charges are not a violation of the Code of Judicial Conduct and that such a finding is not supported by the evidence. We again disagree.
We do not believe it to be necessary to set out in detail the hearing panel’s exhaustive findings of fact concerning Judge Shea’s conduct in respect to the specified charges. We do point out that conduct unbecoming a member of the judiciary may be shown by evidence of an accumulation of small and ostensibly innocuous incidents which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary. See In re Kelly, 238 So.2d 565, 566 (Fla.1970). As the hearing panel’s findings and the record demonstrate, Judge Shea engaged in a pattern of conduct in which he acted with hostility towards attorneys, court personnel, and fellow judges. The totality of the proof in the record supports the conclusion that Judge Shea’s conduct in too many instances was not to the standard required of a member of the judiciary. See id. Judge Shea’s lack of respect and temperament in dealing with others with whom he had contact while he served as a judge seriously undermined public trust in the judicial office. See In re Graham, 620 So.2d 1273 (Fla.1993).
Judge Shea justifies his conduct as an attempt to improve the administration of justice in the Upper Keys and to improve access to mental health resources in the community. In Graham, this Court removed a judge who abused his judicial power but attempted to justify his conduct as an effort to rid the county of what the judge perceived as political favoritism and corruption. This Court found that the alleged misconduct of others did not justify the judge’s departure from the guidelines established in the Code of Judicial Conduct. Id. at 1275. Similarly, Judge Shea’s allegations of improper conduct on the part of others do not excuse his abuse of his judicial office.
Judge Shea argues that the hearing panel’s findings should be rejected in their entirety due to the participation of Judge Frank N. Kaney as chair of the hearing panel of the JQC. Judge Shea moved to recuse Judge Kaney because of Judge Kaney’s participation with Judge Miller and Judge Ptomey (who both had filed complaints against Judge Shea with the JQC) in the Florida Judicial College. Judge Shea alleged that comments made by Judge Kaney to Judge Shea led Judge Shea to believe that Judge Kaney “may have had conversations” with Judge Miller and Judge Ptomey concerning Judge Shea’s case. Such ah allegation is insufficient to support a motion for recusal. To determine if a motion is sufficient this Court looks to see whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial. See Correll v. State, 698 So.2d 522 (Fla.1997). Allegations that Judge Kaney may have communicated with parties involved in Judge Shea’s case do not meet this threshold. Judge Shea’s motion for recusal was properly denied.
Removal is the ultimate sanction in judicial disciplinary proceedings. See In re Graziano, 696 So.2d at 753. This Court will approve a recommendation that a judge be removed from the bench when we conclude that the judge’s conduct is funda *639 mentally inconsistent with the responsibilities of judicial office. Id. Judge Shea’s use of his office to promote his financial interests is inconsistent with the responsibilities of judicial office. Id. In addition to using his judicial office for his own financial purposes, Judge Shea also engaged in a pattern of conduct that further demonstrates an unfitness to hold office. While we do not necessarily find that any one of the other offenses charged would constitute a removable offense individually, when considered together, these charges are evidence of Judge Shea’s abuse of power and require removal.
Accordingly, for the reasons expressed, Steven P. Shea is hereby removed as circuit judge for the Sixteenth Judicial Circuit of Florida, effective upon this opinion becoming final. We direct that Shea pay the costs of these proceedings, limited to the court reporter per diem fees, deposition costs and costs associated with the preparation of the transcript and record. See In re Hapner, 737 So.2d 1075, 1077 (Fla.1999). We remand this ease to the JQC for a determination of the amount of such costs.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, PARIENTE, LEWIS and QUINCE, JJ„ concur.
ANSTEAD, J., recused.